873 P.2d 247

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Frizelle AGUILAR, Defendant–Appellant.**

**No. 20729.**

Supreme Court of New Mexico.

April 11, 1994.

Sammy J. Quintana, Chief Public Defender, Christopher Bulman, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Tom Udall, Atty. Gen., Gail MacQuesten, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

BACA, Justice.

Defendant–Appellant, Frizelle Aguilar, appeals from her convictions of first-degree murder under NMSA 1978, Section 30–2–1(A)(1) (Repl.Pamp.1984) ("willful, deliberate and premeditated killing"), conspiracy to commit first-degree murder under NMSA 1978, Sections 30–28–2 and 30–2–1(A)(1) (Repl.Pamp.1984) ("knowingly combining with another for the purpose of committing a [willful, deliberate and premeditated killing]"), tampering with evidence under NMSA 1978, Section 30–22–5 (Repl.Pamp.1984) ("destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another"), and conspiracy to commit tampering with evidence under Sections 30–28–2 and 30–22–5. The crimes for which Defendant was convicted stemmed from the murder of her son-in-law, Edward Apodaca. The trial court sentenced Defendant to life imprisonment on the murder count, nine years imprisonment on the murder-conspiracy count, and eighteen months imprisonment each on the tampering and tampering-conspiracy counts. The latter three terms were to run concurrently with each other but consecutively to the life imprisonment term. On appeal we address three issues: (1) Whether the State's circumstantial evidence was sufficient to sustain Defendant's first-degree murder conviction when it did not preclude a reasonable hypothesis of innocence; (2) whether, in the alternative, the trial court committed reversible error by refusing Defendant's request to charge second-degree murder; and (3) whether the prosecutor's misconduct deprived Defendant of a fair trial. We review this case pursuant to SCRA 1986, 12–102(A)(2) (Repl.Pamp.1992), and affirm.

## I

The following facts viewed in the light most favorable to sustaining Defendant's conviction, with all conflicts resolved and permissible inferences indulged in favor of the verdict, were adduced at trial. *See State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). In April 1989, while living in South Carolina, Defendant received a telephone call from her daughter, Anne Louise, who was living in Albuquerque. During the telephone conversation, Defendant learned that her daughter had married Edward Apodaca on February 11, 1989. Apodaca was thirty-three years older than Anne Louise, who was twenty-two at the time of their marriage. Defendant hated Apodaca and felt that he had "raped [Anne Louise] and married her all within three days and beat her and drugged her."

Defendant first met Apodaca when she returned to Albuquerque in October 1989. Defendant testified that Apodaca made a pass at her when she arrived and was disrespectful to Anne Louise. Anne Louise moved into Defendant's nearby home for about five weeks and spoke about getting a divorce. In early 1990, Defendant and Anne Louise had a heated argument with Apodaca in the Apodacas' house. Defendant and her daughter, at that time, decided to "get rid of [Apodaca]." Later, outside of her daughter's presence, Defendant asked the Apodacas' housepainter, Joe Scalf, if he would "eliminate" Apodaca for $5000. Scalf testified that he "laughed [the proposition] off". The next day Defendant, under the pretense of seeking an estimate for work on her own home, repeated the offer. When Scalf refused, Defendant asked him if he knew anyone else for the job. A day or two after Scalf refused the offer, Anne Louise removed him from the painting job, with the excuse that he did not have the necessary permits. She had not asked about the permits when she hired him.

On March 22, 1990, Defendant and Anne Louise went to South Carolina. When they received word that Anne Louise's grandmother was dying, they drove back to Albuquerque together, arriving on April 10, 1990. Anne Louise's grandmother died on April 12 and Anne Louise attended a memorial service for her on April 16.

On April 17, Anne Louise discovered her husband's body. He was lying curled on his right side on the couch with his back to the room. He was wearing nothing but an adult diaper (made necessary after prostate surgery). Apodaca died from a single bullet to the left-hand side of the back of the head. The bullet severed his brain stem and he would not have been able to move in any meaningful way after being shot. The evidence indicated that Apodaca was shot from a distance of less than two feet. There were no signs of forced entry and no signs that an altercation had occurred. A pathologist testified that Apodaca died between 4:20 a.m. and 8:20 a.m. on April 17. The gun that fired the bullet was bought by Defendant in South Carolina under the name Frizelle Lagretta Fisher shortly before she drove to

New Mexico in October. Police found the gun in a safety deposit box that was rented by Defendant and Anne Louise on April 17, 1990, under the names F.L. Riley, Sr., and F.L. Riley, Jr. (Defendant testified that she took the gun from the front seat of Apodaca's unlocked car while running errands on April 17.) The serial number of the gun matched that of a gun box found in Defendant's van.

Anne Louise called the police after finding Apodaca's body. One of the detectives who arrived at the scene interviewed Defendant, asking for a detailed account of her actions on the 16th and 17th of April. Defendant related that she spent the afternoon and evening of April 16 shopping and running errands with Anne Louise. Defendant said she dropped Anne Louise off at her home at about 9:00 p.m. and returned to her own home. Upon returning home, Defendant realized that Anne Louise had left her suit there by mistake. She returned to the Apodacas' about 9:15 p.m. and met Anne Louise outside. Defendant stated that she saw and heard Apodaca and that his car was in its normal place. According to several witnesses, however, Apodaca was at the American Legion Post from before 6:00 p.m. until around 11:30 p.m. on April 16. Defendant claimed that Anne Louise went home with her that night and that the next day they ran errands together until Defendant dropped Anne Louise off at her home in the afternoon. At no time during the interview with the detective did Defendant mention her trip to Belen to open the safe deposit box. When asked if she had any guns, Defendant referred only to a gun she had in the house, neglecting to mention the gun she placed in the safe deposit box in Belen.

After Anne Louise was arrested for the murder of her husband, Defendant obtained a death certificate for Apodaca by telling the registrar at the Bureau of Vital Statistics that she was Apodaca's spouse. The State's theory was that the death certificate was needed by Defendant in order to collect the insurance proceeds on Apodaca. When she discovered she needed corrections made on the certificate, however, Defendant could not produce proper photo identification to prove

she was Anne Louise Apodaca and did not obtain the corrected certificate.

Defendant then left New Mexico via Mexico for South Carolina. On her way, she attempted to get into her Belen safe deposit box. While she was in the bank, she changed the rental date and the date opened on the safe deposit box admission record to indicate that the box was rented on April 16—the day before the murder. Defendant was unable to obtain the gun, however, because the police had obtained a search warrant before she arrived at the bank. Defendant was arrested when she arrived in South Carolina.

While in the Bernalillo County Detention Center, Defendant wrote a letter to her ex-husband, H.L. "Bud" Riley. In the letter, Defendant stated that a "professional assasin [sic]" killed Apodaca. She also wrote that Anne Louise "knows nothing about the events of what actually happened.... 'I arranged everything!' 'I am responsible.!' " The jury returned a verdict of guilty on all four counts charged, including murder in the first degree. Defendant appeals claiming that (1) the evidence was insufficient to uphold the first-degree murder and murder-conspiracy convictions; (2) the jury should have been given an instruction on second-degree murder; and (3) the prosecutor's statements regarding the veracity of her story and comments about her taped conversations not admitted as evidence deprived her of a fair trial.

## II

■ We first address whether the State's circumstantial evidence was sufficient to sustain Defendant's first-degree murder-conviction. Defendant contends that the evidence was insufficient because it did not preclude a reasonable hypothesis of innocence. Defendant argues that when the only evidence of the crime is circumstantial, it must be incompatible with the innocence of the accused upon any rational theory and incapable of explanation upon any reasonable hypothesis of defendant's innocence. Defendant argues that Anne Louise committed the murder by herself and that her participation was limited to helping her daughter conceal the crime.

Defendant asks this Court to conclude that the evidence failed to prove that she participated in the murder itself. We decline to so conclude.

■ We test sufficiency of the evidence under the standard set by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Applying *Jackson*, we recently stated that it is "an appellate court's duty on review of a criminal conviction to determine whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). The application of this standard, however, "does not involve substituting the appellate court's judgment for that of the jury in deciding the reasonable-doubt question." *Id.* The court must still view the evidence in the light most favorable to the state, resolving all conflicts and indulging all permissible inferences in favor of a verdict of conviction, but must "ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Id.* This standard does not require that we consider the "merit of evidence that may have supported a verdict to the contrary." *State v. Vigil*, 110 N.M. 254, 256, 794 P.2d 728, 730 (1990).

Here, in order to prove beyond a reasonable doubt that Defendant committed first-degree murder, the State had to prove the following elements.

1. The defendant killed Edward Apodaca, Sr.;

2. The killing was with the deliberate intention to take away the life of Edward Apodaca, Sr.;

3. This happened in New Mexico on or about the 17th day of April, 1990.

*See* SCRA 1986, 14–201. Because the State pursued an accomplice theory, Defendant could be found guilty of first degree murder even though she herself did not commit the acts constituting the crime. Under the accomplice theory, the State had to prove the following elements beyond a reasonable doubt:

1. The defendant intended that the crime be committed;

2. Attempt to commit the crime was committed;

3. The defendant helped, encouraged or caused the crime to be committed.

*See* SCRA 1986, 14–2820. In order to prove conspiracy, the State had to prove beyond a reasonable doubt that:

1. The defendant and another person by words or acts agreed together to commit first degree murder;

2. The defendant and the other person intended to commit first degree murder;

3. This happened in New Mexico on or about the 17th day of April, 1990.

*See* SCRA 1986, 14–2810.

Using the above standard of review, we find that there was overwhelming evidence that Defendant acted with the deliberate intention to take away the life of Apodaca. Because the State used an accomplice theory, it did not need to prove that Defendant actually pulled the trigger, but it did need to prove beyond a reasonable doubt that a first-degree murder occurred, that Defendant intended the murder to happen, and that she "helped, encouraged, or caused" the murder to happen. We conclude that any rational jury could have found beyond a reasonable doubt that Apodaca was murdered. He was shot in the back of the head while sleeping on the couch. The State also proved beyond a reasonable doubt that the killing was intentional. The evidence proved that Apodaca was sleeping at the time of the murder and had his back turned to the murderer. There was no evidence of a struggle or forced entry into the home. There was evidence of a motive to kill on Defendant's part—Defendant admitted to hating Apodaca and attempted to obtain his death certificate in order to cash in on the insurance proceeds. There was also evidence that Defendant had been considering murdering Apodaca for quite some time. Defendant purchased a gun in South Carolina under a different name. Defendant admitted in a letter to her ex-husband that she was "responsible" for Apodaca's death and Defendant had even asked the Apodacas' housepainter to commit the murder.

We also conclude that any rational jury could have found beyond a reasonable doubt that Defendant "helped, encouraged, or caused" the murder to happen. Defendant attempted to solicit someone to commit the murder, purchased the gun that was used to commit the murder, subsequently lied about the whereabouts of the gun, and admitted in a letter that she "arranged everything." With this evidence before it, the jury could have found that Defendant either committed the intentional killing of Apodaca on her own or that she arranged for it to happen.

We next discuss whether the State proved each element of conspiracy beyond a reasonable doubt. In addition to intent, the State must prove that Defendant agreed with another person by words or acts to commit the crime. There was ample evidence from which the jury could have found that Defendant conspired with another person to intentionally kill Apodaca. Defendant and Anne Louise made up an alibi as to their whereabouts on the night of the murder. They also opened the safe deposit box together in which the murder weapon was found. If the jury did not believe that Anne Louise was involved, they could have believed Defendant's statements that she hired an assassin to kill Apodaca and that she "arranged everything." The jury could have found beyond a reasonable doubt that Defendant conspired with another person to kill Apodaca.

### III

■ We next address Defendant's argument that even if there was ample evidence from which the jury could find that Defendant committed or aided in committing first-degree murder, the trial court erred by refusing to charge second-degree murder. Defendant argues that her request to charge second-degree murder should have been granted because the evidence apart from that of deliberation was sufficient to prove the lesser charge. At trial Defendant tendered instructions on second-degree murder and attempt to commit second-degree murder. The trial court denied the instructions. On appeal, Defendant relies on several of our

cases to argue that a second-degree murder instruction was required.

■ Second-degree murder is a lesser included offense of first-degree murder and "[f]or a defendant to be entitled to an instruction for a lesser included offense 'there must be evidence tending to establish the lesser offense' and 'there must be some view of the evidence which could sustain a finding that the lesser offense was the highest degree of the crime committed.'" *State v. Anderson,* 116 N.M. 599, 605, 866 P.2d 327, 333 (1993). Defendant argues that a trial court must submit second-degree murder when, were the jury to disregard the deliberation evidence, they would still be left with a second-degree murder. Accepting this proposition, however, if the jury disregarded the deliberation evidence in this case, there would have been no evidence linking Defendant to the crime except for the murder weapon. This would not prove beyond a reasonable doubt that Defendant committed or was an accomplice to second-degree murder. Here, the evidence simply did not support a finding of second-degree murder. There was absolutely no evidence to support a theory that the killing of Apodaca was accidental, in the heat of passion, or provoked. There was no forced entry and no signs of burglary. Apodaca died from a single shot, at close range, to the back of head, and was shot while sleeping on the couch with his back to the room. There was no evidence that the killing was anything less than deliberate and intentional. "[A]n instruction on second degree murder should not be given when the evidence only supports murder in the first degree." SCRA 1986, 14–211, Committee Commentary; *see also State v. McGuire,* 110 N.M. 304, 313, 795 P.2d 996, 1005 (1990).

Defendant argues that our holding in *Torres v. State,* 39 N.M. 191, 43 P.2d 929 (1935), supports her contention. In that case, the victim was found shot in the side of the head, on a wagon to which a team of horses still stood hitched. The defendant, who had threatened to shoot the victim for stealing $4.60 but later laughed about the theft, was found guilty of the murder. The defendant claimed he had nothing to do with the killing. The court held that it was error not to instruct on second-degree murder because the facts of the case could not be "deemed conclusive in determining the character of the slayer's malice." *Id.* at 196, 43 P.2d at 932. In *Torres,* it was unclear what the circumstances were surrounding the killing. Although the court held that no struggle occurred and that the victim was unarmed and was "not looking at or threatening [the defendant] when the shot was fired," the evidence was not conclusive that the death was not accidental, provoked, or committed in the heat of passion. *Id.* Although *Torres* and this case are similar in that only circumstantial evidence linked the defendants to the killings, in *Torres* it was not clear that the killing was indeed a deliberate act. Here, however, the only possibility was that the killing was a deliberate and intentional act.

Defendant also cites *State v. Segotta,* 100 N.M. 18, 665 P.2d 280 (Ct.App.), *rev'd on other grounds,* 100 N.M. 498, 672 P.2d 1129 (1983), to support her argument. In *Segotta,* the defendant admitted to killing the victim, but claimed that he only intended to frighten the victim. This testimony supported a theory that the killing was not deliberate and intentional and was, therefore, sufficient to support giving an instruction on second-degree murder. *See id.* 100 N.M. at 22, 665 P.2d at 284. *Segotta* fails to support defendant's argument because she failed to supply any evidence to support a theory of second degree murder. Defendant cannot selectively draw on the evidence to suggest that an impulsive killing was possible. Evidence must be viewed as a whole, including both direct and circumstantial evidence. *See State v. Sanchez,* 98 N.M. 428, 430, 649 P.2d 496, 498 (Ct.App.), *cert. denied,* 98 N.M. 478, 649 P.2d 1391 (1982). Because Defendant maintained that she had nothing to do with the death of Apodaca, she did not present any evidence that the killing was anything but deliberate and intentional. Accordingly, we hold that the trial court did not err in refusing to give the requested instructions on second-degree murder.

## IV

Finally, we address whether the prosecutor's misconduct deprived Defendant of a fair

trial. During his closing argument, the prosecutor told the jury that "the only way [Defendant] can be believed is if you say every other witness came in here and for no reason at all lied to you. It doesn't make sense." During Defendant's closing argument, defense counsel accused the housepainter, Joe Scalf, of lying. The prosecutor in his rebuttal stated, "It's not just Joe Scalf that has to be making up lies, if you want to believe her story. It's everybody. It's everybody." The prosecutor also recalled taped conversations, which had been ruled inadmissible as substantive evidence in which Defendant asserted she was "the only one who knows all the evidence." The prosecutor used these statements to argue that Defendant claimed to have known all of the evidence because she was the one that killed Apodaca. Defendant argues that the prosecutor's statements were neither based on the evidence nor properly in response to Defendant's argument as required by the Court of Appeals holding in *State v. Taylor,* 104 N.M. 88, 94, 717 P.2d 64, 70 (Ct.App.), *cert. denied,* 103 N.M. 798, 715 P.2d 71 (1986).

■ We begin our discussion by noting that the defense failed to object during trial to any of the statements made by the prosecutor during his closing argument and rebuttal. In the event that a timely objection was not made to allegedly improper remarks by a prosecutor, we review for fundamental error. *See State v. Ramirez,* 98 N.M. 268, 269, 648 P.2d 307, 308 (1982). This court has held previously that "[t]he doctrine of fundamental error ... applies 'only under exceptional circumstances'" and "may be resorted to if the question of guilt 'is so doubtful that it would shock the conscience to permit the conviction to stand,' or if 'substantial justice' has not been done." *State v. Osborne,* 111 N.M. 654, 662, 808 P.2d 624, 632 (1991) (citations omitted). Defendant's guilt is not so doubtful that it would shock the conscience to permit the conviction to stand. We have previously stated that there was an overwhelming amount of evidence linking Defendant to Apodaca's murder. Defendant, instead, claims that the prosecutor's conduct deprived her of a fair trial.

## A.

■ We first address Defendant's argument that the prosecutor's comments on the veracity of her story deprived her of a fair trial. Prosecutors "may comment on witness's veracity as long as a personal opinion is not expressed and as long as the comments are not intended to incite the passion of the jury." *State v. Stith,* 71 Wash.App. 14, 856 P.2d 415, 419 (1993). Here, the State took the position that Defendant's claim of innocence was inconsistent with the testimony of the State's witnesses. The prosecutor properly reviewed the testimony of the State's witnesses and compared their testimony to Defendant's contradictory assertions. Much of the testimony of the State's witnesses directly contradicted Defendant's account of the events leading up to Apodaca's death. Defendant argues that the prosecutor's comments that for the jury to believe Defendant they would have to disbelieve all the other witnesses resulted in an unfair trial. Specifically, Defendant argues that even though the prosecutor is entitled to a reasonable measure of latitude in his closing argument, his "remarks must be based on the evidence ... or be properly in response to the defendant's argument." *Taylor,* 104 N.M. at 94, 717 P.2d at 70 (citations omitted).

■ We find that in this case, the prosecutor did exactly what the law in New Mexico allowed him to do. He merely argued that the facts in evidence did not support Defendant's story and, therefore, in order to believe her story, the jury must disbelieve all the other witnesses. "It was entirely permissible for the prosecutor to argue the evidence before the jury in such a fashion and to suggest reasonable inferences that might be drawn from that evidence." *Klein v. State,* 105 Nev. 880, 784 P.2d 970, 973 (1989). If after a case is presented, the evidence is essentially reduced to which of two conflicting stories is true, a party may reasonably infer, and thus argue, that the other side is lying. *United States v. Molina,* 934 F.2d 1440, 1445 (9th Cir.1991). The case before us is such a case. The inference here was unavoidable that someone was not telling the truth. Defendant denied ever soliciting the Apodacas' housepainter to murder Apodaca.

The housepainter gave detailed testimony regarding Defendant's solicitation efforts. Defendant claimed that the evening before the murder, she went to the Apodacas' home at 9:15 p.m. and saw and heard Apodaca. She also testified that she saw Apodaca's car in its usual place. Several witnesses, however, testified that Apodaca was at the American Legion Post from sometime before 6:00 p.m. until at least 11:30 p.m. Defendant testified that personnel at the Bureau of Vital Statistics misunderstood her and that she did not attempt to pass herself off as Apodaca's spouse. The clerks who helped Defendant when she attempted to obtain the corrected death certificate, however, testified that Defendant claimed to be Apodaca's spouse, but was unable to provide proper identification. These are a few examples of the contradictory testimony heard throughout the trial. The prosecutor properly suggested to the jury reasonable inferences that could be drawn from the evidence.

### B.

We next address Defendant's argument that the prosecutor improperly referred to evidence outside the record in his closing argument. The prosecutor argued to the jury that Defendant had changed her story to fit the available facts. He referred to a taped telephone conversation Defendant had with Kevin Spriggs, who was assisting Defendant with a book she was writing about the murder, in which they discussed possible scenarios that would fit the physical evidence. During one of the taped conversations between Defendant and Spriggs, Defendant stated that she knew "all the facts" of the case. Defendant also testified that she was "the only one who knows all the facts." The prosecutor, during his rebuttal, refreshed the jury's memory by stating " 'I'm the only one who knows all the evidence,' and that's because she's the one that killed him." Defendant argues that this statement constituted an improper argument because the tape had not been admitted into evidence.

Defendant testified at trial that she was the "only one who knows all the facts." This statement was certainly in evidence and the prosecutor properly referred to it in his closing argument. Because Defendant testified that she was the "only one who knows the facts," we need not discuss whether the taped statements were improperly used. The judgment of the trial court is **AF-FIRMED.**

**IT IS SO ORDERED.**

RANSOM and FRANCHINI, JJ., concur.