887 P.2d 756

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Anne Louise APODACA, Defendant–Appellant.**

**No. 20463.**

Supreme Court of New Mexico.

Nov. 16, 1994.

Benjamin A. Gonzales, Albuquerque, for appellant.

Tom Udall, Atty. Gen., Bill Primm, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

BACA, Chief Justice.

Defendant–Appellant, Anne Louise Apodaca, appeals from convictions of first-degree murder, NMSA 1978, Section 30–2–1(A)(1) (Repl.Pamp.1984), conspiracy to commit first-degree murder, NMSA 1978, Sections 30–28–2 and 30–2–1(A)(1) (Repl.Pamp.1984), tampering with evidence, NMSA 1978, Section 30–22–5 (Repl.Pamp.1984), and conspiracy to commit tampering with evidence, Sections 30–28–2 and 30–22–5. The crimes for which Defendant was convicted stem from the mur-

der of her husband, Edward Apodaca, Sr. The trial court sentenced Defendant to life imprisonment on the murder conviction, nine years imprisonment on the murder-conspiracy conviction, and eighteen months imprisonment each on the tampering and conspiracy to commit tampering convictions. The latter three terms run concurrently with each other but consecutively to the life imprisonment term. On appeal, we address three issues: (1) Whether the State's circumstantial evidence was sufficient to sustain Defendant's first-degree murder conviction if it did not preclude a reasonable hypothesis of innocence; (2) whether the prosecutor's closing statement deprived Defendant of a fair trial; and (3) whether the trial court erred in admitting and excluding various evidentiary information. Because Defendant does not challenge her convictions for tampering with evidence and conspiracy to commit tampering with the evidence, we do not address these convictions. We review this case pursuant to SCRA 1986, 12–102(A)(2) (Repl. Pamp.1992). We affirm as to each issue; therefore, we need not address the denial of Defendant's motion for a new trial or cumulative error.

## I

Sometime during the early morning of April 17, 1990, Edward Apodaca, Sr. was shot in the back of the head while he lay sleeping on a couch in his den. The bullet severed his brain stem, instantly immobilizing him. Gunpowder residue on the pillowcase under his head indicated he was shot from a distance of about two feet. No weapon was found in the house and there were no signs of a forced entry or burglary. The bullet came from a .38 pistol; specifically, the .38 pistol that belonged to Defendant's mother, Frizelle Aguilar. *See State v. Aguilar,* 117 N.M. 501, 505, 873 P.2d 247, 251, *cert. denied,* —— U.S. ——, 115 S.Ct. 168, 130 L.Ed.2d 105, *and cert. denied,* —— U.S. ——, 115 S.Ct. 182, 130 L.Ed.2d 116 (1994).

## II

On appeal, we review "whether substantial evidence of either a direct or

circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all permissible inferences in favor of upholding the verdict. *Id.*

Defendant argues that the State failed to prove that the circumstantial evidence relied upon to support the verdict was "incompatible with her rational theory of innocence," *see State v. Vigil,* 110 N.M. 254, 256, 794 P.2d 728, 730 (1990) (stating that circumstantial evidence *relied upon* to support verdict must be incompatible with any rational theory of defendant's innocence). Defendant alleges that the circumstantial evidence supports her theory that Aguilar, by herself, murdered or arranged for the murder of Apodaca and that Defendant merely helped to conceal the crime. Defendant asserts that "[e]vidence equally consistent with two hypotheses tends to prove neither," *State v. Garcia,* 114 N.M. 269, 275, 837 P.2d 862, 868 (1992) (finding insufficient evidence presented that defendant who committed murder in heat of argument possessed the intent required to sustain first degree murder conviction); *State v. Malouff,* 81 N.M. 619, 621, 471 P.2d 189, 192 (Ct.App.1970) (finding insufficient evidence to sustain convictions of unlawful taking of motor vehicle). In *Malouff,* the court noted that "when circumstances alone are relied upon, they must point unerringly to defendants and be incompatible with and exclude every reasonable hypothesis other than guilt." *Id.* at 620, 471 P.2d at 190. The court in *Malouff* found that although evidence indicated that a stolen car had been temporarily located in a garage at the defendants' mother's home before it was stripped and then recovered from a wrecking yard, the state presented no evidence that the parts recovered from the garage were taken from the recovered car or that the defendants had exclusive possession of the car parts. "For the jury to have reached the conclusion, that both defendants had control and dominion over the garage they had to speculate. This it may not do." *Id.* at 621, 471 P.2d at 191.

We require that evidence point logically to a defendant and exclude other reasonable hypotheses of innocence to assure that the basis of a conviction is not mere speculation. *Id.* However, this does not mean that we may reweigh the evidence presented to determine the comparative credibility of Defendant's theory. Nor may we substitute our judgment for that of the jury. *State v. Lankford,* 92 N.M. 1, 2, 582 P.2d 378, 379 (1978). Only the jury may resolve factual discrepancies arising from conflicting evidence. *Id.* In *Vigil* we explain that "incompatible with any rational theory of ... innocence" means "the evidence supporting the verdict [must] provide a sufficient basis upon which to infer guilt beyond a reasonable doubt." *Vigil,* 110 N.M. at 256, 794 P.2d at 730. There is no reasonable-doubt preclusion unless circumstantial evidence *viewed in the light most favorable to the State* also gives rise to an equally reasonable inference of innocence.

Rather than presenting a new standard of review, " '*Garcia* merely reiterate[s] the established law that the standard must be viewed in the context of the state's burden below—to prove each element of the crime beyond a reasonable doubt.' " *State v. Sanders,* 117 N.M. 452, 456, 872 P.2d 870, 874 (1994) (quoting *State v. Orgain,* 115 N.M. 123, 126, 847 P.2d 1377, 1380 (Ct.App.), *cert. denied,* 115 N.M. 145, 848 P.2d 531 (1993)). Our review consists of a two-step process: First we review the evidence under the *Sutphin/Lankford* standard with deference to the trial court's resolution of factual conflicts and inferences; then we make a legal determination of whether the evidence viewed in this manner "could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.; see also Orgain,* 115 N.M. at 126, 847 P.2d at 1380 (finding as sufficient to sustain conviction of forgery that defendant arranged for and accompanied his accomplice on trips to bank and agreed to share in proceeds). An appellate court may reject testimony that the factfinder has believed "only if there is a physical impossibility that the statements are true or the falsity

of the statement is apparent without resort to inferences or deductions." *Sanders,* 117 N.M. at 457, 872 P.2d at 875. Defendant would have us make inferences or deductions that would cause us to reject testimony relied on by the jury. This we decline to do.

In the present case, the State had the burden of proving beyond a reasonable doubt that Defendant committed first-degree murder. To meet its burden of proof, the State had to prove that (1) Defendant killed Apodaca, (2) the killing was with the deliberate intention to take away his life, and (3) this occurred in New Mexico on or about the 17th day of April, 1990. *See* SCRA 1986, 14–201. Defendant does not dispute that Apodaca was murdered during the early morning hours of April 17, 1990. To prove Defendant killed Apodaca, the State relied on the accomplice theory and had to prove that (1) Defendant intended that the crime be committed, (2) the crime was committed, and (3) Defendant helped, encouraged or caused the crime to be committed. *See* SCRA 14–2822.

**A**

■ First we review the evidence under the *Sutphin/Lankford* standard in the light most favorable to sustaining Defendant's conviction of first-degree murder. There is no direct evidence as to who fired the murder weapon. We agree with Defendant that circumstantial evidence substantially implicates Aguilar because she "admitted to hating Apodaca and attempted to obtain his death certificate in order to cash in on the insurance proceeds.... [In addition, she] attempted to solicit someone to commit the murder, purchased the gun that was used to commit the murder," and the day after the murder she concealed the gun in a safe deposit box in a Belen bank. *Aguilar,* 117 N.M. at 505, 873 P.2d at 251.

However, the evidence shows that Aguilar was not alone when she placed the gun in the safe deposit box. Defendant accompanied Aguilar and also signed the bank's registration form for the box. Although both Defendant and Aguilar told Detective Cantwell what they had done the day after the murder, neither mentioned that they had gone to Belen. Neither mentioned that they had placed the gun in a safe deposit box. The jury saw the witnesses, heard the testimony, and determined its appropriate credibility. Concealment may be considered as a "circumstance tending to show a consciousness of guilt." SCRA 14–5006. A rational jury could consider Defendant's participation in concealing the murder weapon, combined with all the other evidence presented, as more than merely helping her mother conceal the crime.

■ Aguilar testified that on the day before the murder the two of them spent the afternoon and evening together and that night "[w]e slept in the very same bed, with her [Defendant's] long, beautiful legs wrapped around my legs." A rational jury could have believed that Aguilar could not have gotten out of bed during the early morning hours to go over to kill Apodaca without Defendant knowing about it. Defendant argues that Aguilar gave her a valium about 10:00 p.m. and, therefore, she could not have participated in the murder. Defendant presents no evidence that a valium would have incapacitated her. However, it is possible that the jury could have dismissed this issue entirely because under the accomplice theory, Defendant did not need to participate in the actual murder. *See State v. Ballinger,* 99 N.M. 707, 710, 663 P.2d 366, 369 (Ct.App. 1983) (holding that even if jury refused to find defendant committed murder, it could have found defendant intended the crime to be committed, it was committed, and he "helped, encouraged or caused" the crime), *rev'd on other grounds,* 100 N.M. 583, 673 P.2d 1316 (1984).

In addition to the events of the day before and after the murder, six witnesses testified that Defendant had told them she wanted her husband dead. Several witnesses suggested to Defendant that she should just divorce her husband. She specifically told two of them she could not do that because she wanted the house and insurance. Defendant expressly solicited three of these witnesses to kill her husband.

Witness Cynthia Carpenter testified that every day over a period of time Defendant spoke to her about killing Apodaca. Carpen-

ter finally asked her to "cut it out because [she] didn't think it was funny." After the admonition, Defendant mentioned killing her husband only once a week. Witnesses also testified that Defendant inquired about buying or building a silencer for her gun or finding a substance that could not be traced in Apodaca's body. While the witnesses stated that they did not take Defendant's comments seriously, it was the prerogative of the jury to determine what credibility to give the testimony. Defendant presented evidence that people could take advantage of her, that she may have fetal alcohol syndrome, that she is immature and childish, and in anger she would make statements wishing someone were dead. However, a rational jury could view Defendant's statements made in anger wishing someone were dead quite differently from her repeated attempts to find someone to kill her husband. The jury heard testimony that she appeared to be "joking" when she initiated inquiries about killing her husband. The jury decided what weight to give to the testimony. A rational jury could have found beyond a reasonable doubt that Defendant had the requisite intent to kill her husband or that the crime be committed.

Furthermore, the jury could have found a sufficient motive for the murder. Defendant was the beneficiary of several life insurance policies, which if current, would have totaled about $400,000. Defendant effectively showed that not all the policies were current. A couple of months before Apodaca's death, the Defendant and Apodaca took out an insurance policy that would pay off the $112,-000 home mortgage when either of them died. Defendant participated in the purchase of the policy, she wrote the check, picked up the policy, and signed the receipt. Yet during the investigation, Defendant told Detective Cantwell when asked about insurance that "she thought that he had something, but she didn't know what they were. She didn't know anything about his insurance." Defendant argued that she would have taken out term rather than a universal life policy had she intended to "weave this web" to murder Apodaca and collect on the policies. However, the jury rejected Defendant's argument. A rational jury could reasonably infer that Defendant was uncon-

cerned about or unaware of the higher costs of universal life insurance, that she *believed* the policies were in effect, or that she intended to collect the proceeds from the insurance policies that she knew were current and to obtain title to the house.

The evidence also indicates that Defendant acknowledged owning a handgun, a .25 automatic pistol. When she turned the gun over to Detective Wilson, she explained that it would be dirty because she shot it occasionally. A rational jury could have inferred that Defendant knew how to shoot a gun and that she, herself, shot her husband, using her mother's .38 which she then left in her husband's car where her mother testified that she found it the morning after the murder.

The jury weighed Defendant's theories against the testimony of the various witnesses. We may not substitute our judgment for that of the jury. "[C]onsider[ing] the evidence and all reasonable inferences therefrom in support of the verdict and not the merit of evidence that may have supported a verdict to the contrary," *Vigil,* 110 N.M. at 256, 794 P.2d at 730, we find the evidence sufficient to support the jury's factual determinations.

Next we make a legal determination of whether the evidence was sufficient to support the verdict. *Sanders,* 117 N.M. at 456, 872 P.2d at 874. The only unresolved legal issue is whether Defendant committed the murder, either directly or as an accomplice, or whether she merely helped Aguilar conceal the murder weapon. The State presented evidence that Defendant repeatedly discussed murdering her husband and asked for advice about how to do so. She attempted to solicit three persons to commit murder for her and stated that she would lose the house if she got a divorce. She acknowledged owning a gun and knowing how to shoot it. She concocted a false cover story as to her activities the day before and after the murder and accompanied her mother to Belen to conceal the murder weapon. This evidence does not support a finding that Defendant only participated in aiding her mother to conceal the murder weapon. We find overwhelming evidence to support the jury's verdict that De-

fendant intended to kill Apodaca and she either committed the murder herself or helped, encouraged, or caused it to happen.

**B**

We next discuss whether the State proved each element of conspiracy beyond a reasonable doubt. To meet its burden of proof under the theory of conspiracy, the State had to prove that (1) Defendant and another by words or acts agreed together to commit first-degree murder, (2) Defendant and another intended to commit first-degree murder, and (3) Apodaca was murdered on or about the 17th day of April, 1990. *See* SCRA 14–2810. Circumstantial evidence and conduct of the parties is sufficient to establish a "common design or agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means." *State v. Chavez*, 99 N.M. 609, 611, 661 P.2d 887, 889 (1983); *State v. Bankert*, 117 N.M. 614, 622, 875 P.2d 370, 378 (1994). The State presented ample evidence that Defendant and Aguilar conspired with each other to intentionally kill Apodaca. In February, 1990, Defendant told Carpenter that she had asked her mother to kill Apodaca, but her mother had said, "No." Defendant stated that she was "going to ask her again."

Witness Joe Scalf testified that while he was painting Defendant's house, Aguilar pointedly offered him $5,000 to "eliminate" Apodaca. He laughed off the offer, thinking she was joking. Aguilar approached him again the next day, told him "it was not a bad joke, that [she] was very serious, and reoffered the $5,000." While they were talking, Defendant joined the conversation and agreed with Aguilar that Apodaca had to be "eliminated." When Scalf again declined, Aguilar, in Defendant's presence, asked him if he could find someone who would do it. Defendant did not object to her mother's inquiries. *See State v. Gilliam*, 60 N.M. 129, 132–33, 288 P.2d 675, 677 (1955) (finding as admissible statement made in defendant's presence that defendant did not deny or respond to in any way; silence indicated acquiescence in truth of statement).

The evidence also indicates that Defendant and Aguilar were together the day before and after the murder. Their accounts of what they did were sufficiently different to arouse Detective Cantwell's suspicions that they had constructed a false cover story. They failed to mention to Detective Cantwell that they had gone to Belen the day of the murder. In Belen they opened a safe deposit box for the express purpose of concealing the murder weapon, using aliases of F.L. Riley, Jr. and F.L. Riley, Sr. The jury heard Defendant assert that she was distraught by her grandmother's death and funeral the day before Apodaca's murder and could not have participated in the crime. The jury determined the appropriate credibility to give to the evidence presented by both parties. We defer to the jury's resolution of the conflicting testimony. We review the evidence to determine whether it is sufficient to support the verdict of conspiracy to commit first-degree murder. Defendant asserted that she was going to persuade her mother to help her kill Apodaca. She participated in the attempted solicitation of Scalf and agreed that Apodaca had to be eliminated. Defendant spent the day before and after the murder with her mother and both concocted a false cover story. Defendant actively participated in the concealment of the murder weapon by signing the safe deposit registration form. We find the evidence sufficient to support that Defendant and Aguilar together agreed and conspired to commit first-degree murder and intended for the murder to take place.

**III**

We next address whether the prosecutor incorrectly instructed the jury on the law, thereby depriving Defendant of a fair trial. During his closing argument, the prosecutor told the jury that "I don't have to prove who pulled the trigger...." and "[i]t doesn't matter who pulled the trigger that night." Defendant argues that the State was obligated to prove that *either* Defendant or Aguilar killed Apodaca. Instead, the State "left it to the jury to decide whether Defendant played a role in that killing." Because Defendant failed to object to this statement during trial, we review for fundamental error. *See Aguilar*, 117 N.M. at 507, 873 P.2d

at 253. The doctrine of fundamental error is resorted to when fundamental rights are at stake and " 'substantial justice' has not been done," *State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991), or "the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand." *Id.* (quoting *State v. Rogers*, 80 N.M. 230, 232, 453 P.2d 593, 595 (Ct.App.1969)).

In reviewing the prosecutor's closing argument in its entirety to understand its potential effect on the jury, *State v. Griffin*, 116 N.M. 689, 698, 866 P.2d 1156, 1165 (1993), we find the State properly explained its burden of proof and then told the jury that "[t]he defendant may be found guilty of a crime even though she herself did not do the act constituting the crime, if . . . she intended for it to be committed and it was committed and she either helped, encouraged or caused [the deed]." The State was not "asking the jury to speculate and to guess who killed Ed Apodaca, Sr.," the statement did not shift the burden of proof to the Defendant, and it did not usurp the role of the judiciary. The State merely enunciated its burden of proof under the accomplice theory. *See* SCRA 14–2822. Because we find the prosecutor correctly stated the law, it does not "shock the conscience to permit the conviction to stand." *Osborne*, 111 N.M. at 662, 808 P.2d at 632.

## IV

Finally, we decide whether the trial court erred in admitting and excluding various evidentiary information, thus depriving Defendant of a fair trial. Defendant argues that the trial court erred in (1) admitting Aguilar's out-of-court statements to Detective Cantwell, (2) permitting the introduction of the insurance documents contained in Defendant's briefcase without proper authentication, and (3) limiting the presentation of Defendant's case by excluding the introduction of Aguilar's testimony about the death of her ex-husband, Herbert Fischer, testimony about her prior conviction, and her letter to Bud Riley. We discuss these evidentiary issues separately.

## A

Defendant argues that the court erred in permitting Detective Cantwell to testify about the statements Aguilar made during the investigation on April 17, 1990. The court permitted Detective Cantwell to compare the statements Defendant and Aguilar gave her concerning their whereabouts the day before and after the murder. On review we defer to the trial judge's decision to admit or exclude evidence and we will not reverse absent a clear abuse of discretion. *Garrett v. Howden*, 73 N.M. 307, 312–13, 387 P.2d 874, 878–79 (1963) (declining to interfere with trial court's decision when full consideration was given to question and court under no misapprehension of law on subject); *accord Griffin*, 116 N.M. at 697, 866 P.2d at 1164 (deferring to trial court absent an abuse of discretion). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Simonson*, 100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983). "We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Litteral*, 110 N.M. 138, 141, 793 P.2d 268, 271 (1990).

Defendant's statements, admissible against her under SCRA 1986, 11–801(D)(2)(a) (Repl. Pamp.1994) (admission by party opponent), agree with the first half of Aguilar's statements. Therefore, there can be no prejudice against Defendant for the admission of this portion of Aguilar's statements. *See Vigil*, 110 N.M. at 258, 794 P.2d at 732 (finding statement attributed to defendant not hearsay because it was an admission).

Defendant relies on *State v. Pacheco*, 110 N.M. 599, 798 P.2d 200 (Ct.App.), *cert. denied*, 110 N.M. 533, 797 P.2d 983 (1990), in which the court found that the admission of an out-of-court statement required reversal and a new trial. *Id.* at 603–04, 798 P.2d at 204–05. *Pacheco* is distinguished, however, because in that case the affidavit of a third party *who was unavailable for trial* was being used to assert the truth of the matter. The affidavit showed that the defendant had told the third party a false cover story. The prosecution tried to use the affidavit to im-

peach the defendant after he denied concocting a cover story. *Id.* The court noted that if the third party "had been present and had testified at trial, there would be no hearsay problem, even though his testimony related to out-of-court statements made by defendants." *Id.* at 601, 798 P.2d at 202. In the present case, the State did not introduce Aguilar's statements to prove the truth of the matter asserted, i.e., what Aguilar and Defendant did the day after the murder, thus the statements are not hearsay. The court instructed the jury that the statements were admitted "not for the truth of the statement, but to show why the officer conducted the investigation as she did, from that point forward." *Cf. State v. Montoya*, 114 N.M. 221, 223–24, 836 P.2d 667, 669–70 (Ct.App.1992) (precluding admission of out-of-court statement offered to show why officers obtained warrant to search defendant's house because statement was highly prejudicial and basis of warrant was collateral issue with negligible probative value). The court agreed that it was important for the jury to understand why Detective Cantwell changed the course of her investigation. Admission of the statements supporting the reasonableness of Detective Cantwell's conduct was not unfairly prejudicial to Defendant. Because we find Aguilar's statements were properly admitted to show the reasonableness of Detective Cantwell's conduct, we do not need to consider Defendant's other arguments.

**B**

 Defendant argues that the trial court erred in admitting some of the contents of Defendant's briefcase. Determination of the trustworthiness of documents is left to the discretion of the court and is reviewable only for an abuse of discretion. *See Kirk Co. v. Ashcraft*, 101 N.M. 462, 468, 684 P.2d 1127, 1131 (1984) (upholding trial court's admission of documents kept in the ordinary course of business); *State v. Wynne*, 108 N.M. 134, 139, 767 P.2d 373, 378 (Ct.App.1988) (upholding trial court's admission of receipts for purchases of chemicals and equipment as proof defendant had actually made these purchases), *cert. denied*, 108 N.M. 115, 767 P.2d 354 (1989).

██ Defendant asserts that the insurance policies in the briefcase were inadmissible under any hearsay exception and the admission violates her constitutional rights to confrontation. "The Confrontation Clause of the Sixth Amendment to the United States Constitution and Article II, Section 14, of the New Mexico Constitution guarantee a defendant in a criminal prosecution the right to confront the witnesses against him." *State v. Sanders*, 117 N.M. at 459, 872 P.2d at 877. The right of confrontation is not absolute and "extends only to the right 'to be confronted with the witnesses against him.'" *State v. Barton*, 79 N.M. 70, 74, 439 P.2d 719, 723 (1968). Statements that are not offered for the truth of the matter asserted are not "witnesses against" Defendant. *Cf. id.* (holding that statements to police could not be construed as connecting defendant with crime and therefore person making statement was not a "witness against" defendant).

██ Defendant argues that the State failed to show "whether that insurance even pertained to Defendant as a beneficiary," *see State v. Young*, 103 N.M. 313, 316, 706 P.2d 855, 858 (Ct.App.), *cert. denied* (Aug. 13, 1985). *Young* requires that the evidence must be "connected with the defendant, the victim, or the crime itself." *Id.* The purpose of authentication is to show that the evidence is what it purports to be. *Id.* at 318–19, 706 P.2d at 860–61. Not all of the insurance policies were offered for the truth of the matter asserted. *See Pacheco*, 110 N.M. at 601, 798 P.2d at 202 (stating out-of-court declarations by defendant to third party were evidence of guilt). All the policies contained either Defendant's or Apodaca's name on them. It was immaterial as to whether the policies were valid and current. Detective Cantwell repeatedly testified that she "didn't check them out" and found "things being cancelled" and "things lapsing." Had Defendant cross-examined witnesses directly connected with these many policies, she would have produced the same information. The jury was aware that not all the policies were in effect. In reviewing the record, we note that Defendant had told several witnesses that she could not divorce Apodaca and keep the house. She men-

tioned to one witness that the insurance policies would pay off the mortgage "if anything happened to him." The evidence is relevant because it shows that Defendant had knowledge of the policies. This knowledge, when combined with her statements to various witnesses, is material to the inference of motive.

Defendant had the opportunity to confront witnesses for the two major policies that were offered for the truth of the matter asserted, the $112,000 home mortgage policy and the $37,000 life insurance policy. *See Sanders*, 117 N.M. at 459, 872 P.2d at 877 (stating that the main purpose of confrontation is to provide an opportunity for cross-examination). Although Defendant's requested limiting instruction was denied, the court and Defendant both acknowledged that the other documents were offered "merely to show that they were in Defendant's possession and control and to show her motive to kill her husband." We find that admission of these documents to show knowledge and motive does not violate Defendant's right to confrontation.

## C

■ Next Defendant argues that the court improperly limited the presentation of her defense by excluding Aguilar's testimony about Fischer's death, testimony about Aguilar's prior conviction for aggravated battery with a deadly weapon, and redacting Aguilar's letter to Riley. The court granted the State's motion in limine that precluded Defendant from introducing evidence that after Fischer committed suicide, Aguilar kept his body in a closet from 1974 to 1977 before turning it over to the authorities. Initially Defendant sought to introduce this evidence to show that Aguilar had knowledge about donating a body to the university. The court granted this limited use of the evidence. Later that day, Defendant decided to use the full evidence to impeach Aguilar and now argues that this evidence shows Aguilar's motive to murder Apodaca. Although Defendant failed to object to the court's decision to preclude this evidence, she contends that her mere mention of the evidence earlier that morning was sufficient to preserve the issue. We disagree.

■ Defendant had the duty to inform the court of the nature of her objection so that the court could make an informed decision as to its admissibility. *State v. Lopez*, 84 N.M. 805, 809, 508 P.2d 1292, 1296 (1973) (finding defendant's motion for directed verdict based on state's general failure to "prove all essential elements of a prima facie case" was insufficient to serve as notice of objection to venue; purpose of objection is to invoke ruling upon question and it is essential that court is informed of specific grounds for objection). The Defendant not only waited until the afternoon to inform the court as to what evidence she intended to present, she acquiesced to the court's second decision to exclude the evidence with her statement that "I know the Court ruled that we couldn't do that [discuss Fischer's interment], so I wanted to say that [presumably referring to her earlier statement that the evidence went to motive], because I didn't know if it was clear, when we talked about it this morning, as to exactly what we were talking about. I understand the Court's ruling." Defendant acknowledged the court's ruling but did not object to it. *See State v. Lucero*, 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App.1986) (holding "objection must be sufficiently timely and specific to apprise the trial court of the nature of the claimed error and to invoke an intelligent ruling by the court"; when testimony became accusatory, defendant should have objected again).

Before the court can adequately determine whether the evidence is relevant, the Defendant must inform the court how the evidence relates to the issues before it. This the Defendant failed to do. Defendant did argue that Aguilar had threatened Fischer before he committed suicide. In reviewing the record, it is difficult to connect Aguilar's threats or her decision to inter Fischer in the closet nearly twenty years ago with Apodaca's murder in 1990. No allegations or charges were brought against Aguilar for Fischer's death and there is no proof of any wrongdoing associated with the event. At most the evidence would have confused or misled the jury, possibly resulting in speculation as to whether charges should have been brought against Aguilar nearly twenty years ago.

Such digression is specifically what we seek to avoid. *See* SCRA 11–402 (irrelevant evidence inadmissible); *State v. Platt*, 114 N.M. 721, 724, 845 P.2d 815, 818 (Ct.App.) (finding court properly excluded evidence to avoid creating a "trial within a trial" that would distract the jury), *cert. denied*, 114 N.M. 501, 841 P.2d 549 (1992). We find the court did not abuse its discretion.

■ Defendant argues that the court erred in refusing to permit Defendant to ask questions a third time concerning Aguilar's 1983 conviction for attempting to run over Defendant and Riley, ruling that it also was too remote. Defendant intended to show that Aguilar had already "tried to kill her own daughter and she keeps coming back." We review for an abuse of discretion. *State v. Landers*, 115 N.M. 514, 518–19, 853 P.2d 1270, 1274–75 (Ct.App.1992) (holding that evidence of defendant's prior sexual conduct with victim of sex crime was relevant to issue of credibility and not offered only to show character or propensity to commit the crime), *cert. quashed*, 115 N.M. 535, 854 P.2d 362 (1993). In order to warrant reversible error, Defendant "must show a reasonable probability that the court's failure to allow the testimony contributed to [her] conviction." *State v. Gonzales*, 112 N.M. 544, 552, 817 P.2d 1186, 1194 (1991).

Defendant acknowledged that the information "already came in through Cynthia Carpenter.... [and] through Frizelle [Aguilar]. I was just going to have him explain it." The court only prohibited Defendant's attempt to introduce this same information through Riley. When the court suggested Defendant make a tender, she declined. Defendant has not shown a reasonable probability that the failure to allow the testimony a third time contributed to her conviction. *See Gonzales*, 112 N.M. at 552, 817 P.2d at 1194. We find the court properly exercised its discretion.

■ Finally, Defendant argues that the court erred in redacting Aguilar's letter of June 1, 1990 to Riley. As previously stated, we review the court's decision to exclude the evidence under the abuse of discretion standard. The letter was not admissible under SCRA 11–801(D)(2)(e) because the conspiracy clearly had ended with Aguilar's arrest on May 3, 1990, if not before. The record indicates that the only portion of the letter that was omitted was the statement that "Snooky [Defendant] is innocent." The essence of this statement was presented through other sentences in the letter that were admitted. The trial court carefully weighed the probative value of this sentence against the danger of unfair prejudice. *See* SCRA 11–403. The court, by permitting the entire letter except for this one sentence, exercised its discretion. We do not find such an exercise of discretion "untenable or not justified by reason."

## V

In conclusion, we find the evidence sufficient to sustain Defendant's first-degree murder and conspiracy to commit first-degree murder convictions, that the prosecutor's statement during closing argument did not constitute fundamental error, and that the trial court properly exercised its discretion in admitting some and excluding other evidence offered by Defendant. We affirm.

RANSOM and FRANCHINI, JJ., concur.