This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                    **No. 30,077**

**ADRIAN MACIAS-MARTINEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Lisa Schultz, District Judge**

Gary K. King, Attorney General
Margaret McLean, Assistant Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

Jacqueline L. Cooper, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

Defendant Adrian Macias-Martinez appeals his conviction after a jury trial for criminal sexual penetration in violation of NMSA 1978, Section 30-9-11(F) (2007) (amended 2009). Defendant argues that the evidence was insufficient for conviction.

The incident from which the charges arose occurred on or about September 10, 2006, as Victim walked home late at night after visiting friends. Defendant acknowledges that he had a sexual encounter with Victim at that time, but he asserts that the encounter was consensual and that there was no sexual penetration.

**STANDARD OF REVIEW**

When reviewing a claim of insufficiency of the evidence, we determine whether substantial evidence, either direct or circumstantial, "exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Apodaca*, 118 N.M. 762, 765-66, 887 P.2d 756, 759-60 (1994) (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "The reviewing court does not weigh the evidence or substitute its judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *State v. Mora*, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds as recognized in Kersey v. Hatch*, 2010-NMSC-020, 148 N.M. 381, 237 P.3d 683. "In

reviewing the sufficiency of evidence used to support a conviction, we resolve all disputed facts in favor of the [verdict], indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Rojo*, 1999-NMSC-001, ¶ 19. We determine as a matter of law "whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Apodaca*, 118 N.M. at 766, 887 P.2d at 760 (internal quotation marks and citation omitted).

**DISCUSSION**

The jury convicted Defendant of criminal sexual penetration in violation of Section 30-9-11(F). The district court instructed the jury as follows on this charge:

> For you to find . . . [D]efendant guilty of criminal sexual penetration as charged as an included offense in Count 2, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. . . . [D]efendant caused [Victim] to engage in sexual intercourse;
>
> 2. . . . [D]efendant caused [Victim] to engage in sexual intercourse through the use of physical force or physical violence;
>
> 3. This happened in New Mexico on or about the 10th day of September, 2006.

3

*See* UJI 14-941 NMRA. In another instruction, the district court defined sexual intercourse as follows: "Sexual intercourse means the penetration of the vagina, the female sex organ, by the penis, the male sex organ, to any extent." *See* UJI 14-982 NMRA.

Defendant argues that neither of the substantive elements of the offense of criminal sexual penetration were present: there was no sexual intercourse and no physical force or physical violence occurred. The extensive testimony of the State's witnesses, including Victim herself, indicate otherwise. Victim testified as follows. She had gone out to dinner with friends on the evening of September 9, 2006. She recalled having two drinks at the restaurant, then two or three more at the home of her friends, S.M. and M.F. As the evening began to wind down, she felt "buzzed" but not "completely drunk" and was invited to spend the night at S.M.'s and M.F.'s home. Because her father's home and his girlfriend's home were both nearby, Victim decided not to stay, but to walk home. She took a shortcut through a pecan orchard, where she encountered Defendant sitting on the ground. Victim, somewhat startled by Defendant's presence, said hello to him and had a conversation with him in Spanish. Although the conversation was initially light, after a few minutes it became "really weird," with Defendant saying things like Victim was pretty and he wanted to kiss her. Victim who had been squatting near Defendant, jumped up and said she had

to go. Defendant grabbed her right wrist and would not let go as she struggled to leave. Defendant then "pushed–sort of like laid [her] on the ground," at which point she screamed for help. Defendant covered her mouth such that she could not breathe. Defendant brushed her underwear to the side and sexually penetrated her for "maybe like two minutes." Although actually older, Victim had repeated to Defendant in Spanish that she was only seventeen, and eventually Defendant "stopped and sort of . . .moved away," then told her to go. Victim ran away, disoriented and unsure of her whereabouts, she ran into a chest-high wire that almost knocked her over. Once Victim determined where she was, she ran back to S.M.'s house. Victim acknowledged that she had previously said she was not sure penetration occurred, but she had felt "numb" and "paralyzed with this fear." She thought Defendant had ejaculated inside her.

Victim further testified concerning the events that followed the incident, including the examination by the sexual assault nurse examiner (SANE) and the investigation by Sheriff's Investigator John Rubio. Several of the persons with whom she interacted around the time of the incident also testified. M.F.'s testimony concerning events earlier in the evening were generally consistent with Victim's testimony. M.F. testified that she believed Victim was intoxicated, but that she could stand up and speak intelligibly. After discovering that Victim had left their home

5

rather than spending the night there, M.F. and S.M. went out twice, once in M.F.'s car and once in S.M.'s car, to look for her, but returned without finding her. They decided to go to bed, but about ten minutes after they did so Victim knocked on their door. S.M. answered the door, and when M.F. entered the room, Victim was sitting on the couch crying. Victim "said something along the lines of, 'I was raped'" and asked them to call the police. M.F. described Victim as "just very upset and just kind of–I mean, hysterically crying." She estimated that Victim had been gone from the home twenty or thirty minutes. On cross-examination, M.F. testified that while she was rubbing Victim's back to comfort her, she had not noticed any leaves or dirt or the like on Victim's back.

S.M. also testified, again generally consistent with the previous testimony as to the sequence of events, including Victim's statement, "I've been raped," when he answered the door. S.M. testified that he knew Victim was not kidding because "[s]he looked horrified on her face. Her face had a look of being horrified. Her clothes were disheveled. She had a small cut on her cheek. Her hair was disheveled. She looked really, really distraught[.]"

Two sheriff's officers testified. Deputy Paul Telles testified that he had been dispatched to S.M.'s home around 1:00 a.m. on September 10, 2006. Deputy Telles met S.M., whom he described as "very hyper," in front of the home and then went

6

inside, where he encountered Victim sitting on a couch. Deputy Telles described her as "scared[,]" "crying[,]" and "very upset[,]" and he noted an injury on her arm and a scratch on her leg. Victim told Deputy Telles that a male individual had "popped out of nowhere and just started a conversation with her." She described the assault to Deputy Telles, and upon being asked if she had been penetrated, she could not tell him if she was or not. Deputy Telles did not observe any signs of intoxication in Victim. After the ambulance arrived, he went to the hospital but had no further contact with Victim, S.M., and M.F.

Sheriff's Investigator John Rubio, who took over the investigation, first spoke to Victim in the SANE examination room at the hospital. When he entered, Victim was on the couch "kind of curled up a little bit." Upon introducing himself, Investigator Rubio noticed that she seemed "kind of confused and tired[.]" Victim described her attacker as a twenty- to thirty-year-old Spanish-speaking male, about 145 to 180 pounds, wearing a baseball cap and having a mustache and goatee. Upon being asked if she had been penetrated, Victim said she felt numb in "that area" and could not recall if she had been penetrated. At some point, however, Victim also told Investigator Rubio that her underwear had been pushed aside and that she had been raped. After the sun came up, the morning following the assault, Investigator Rubio first went to S.M.'s house and got a feel for the area where the attack had occurred,

7

including the pecan orchard. He recalled that Victim had told him she had lost her wallet, so he began looking for it. At some point in his search, Investigator Rubio encountered Defendant and noticed that although he was tan, he had a white area where he had recently shaved his chin. Investigator Rubio did not tell Defendant that he was investigating a sexual assault, but persuaded Defendant to give him a saliva sample and a fingerprint. Investigator Rubio also took DNA swabs of two other men at the orchard a few days later, Mario Armendariz-Hernandez and Jose Franco.

The SANE nurse, Melissa Copeland, who had examined Victim, testified as an expert in the area of sexual assault nurse examinations. Ms. Copeland described Victim as appearing "very sober," although Victim had acknowledged that she had several drinks the night before. Victim's affect was tearful at times, trembling at times, and she made good eye contact and was very cooperative. Victim told Ms. Copeland that she had been raped and specifically that her assailant had pushed her panties aside and penetrated her vagina with his penis. Ms. Copeland examined Victim's outer body and noted a number of scratches, bruises, and abrasions, which she photographed and documented. Ms. Copeland also examined Victim's genital area. She did not find any injuries, but explained that this was not significant in determining whether a sexual assault had occurred. Finally, Ms. Copeland testified

in detail concerning the process by which she collected DNA samples from several areas inside and outside the vagina.

The State's final witness, Thomas Fedor, testified as a DNA analysis expert. After testifying regarding the shipping and packaging of the DNA samples to establish a chain of custody, he identified the various samples taken from Defendant, Victim, and two other individuals who were in the vicinity of the orchard where the assault took place. Mr. Fedor then discussed the process by which fifteen different markers in a DNA sample are identified and compared. Mr. Fedor testified that the DNA from the vaginal samples taken from Victim and the samples taken from Defendant contained the same DNA. He described the odds of two different individuals matching all fifteen DNA markers as "astronomical" and later quantified the odds of a person other than Defendant being the source of the tested DNA as one in 150 sextillion, which is expressed as the number 150, with twenty-one zeroes after it.

In addition to testifying on his own behalf, Defendant presented the testimony of Jose Franco, one of the two men who were present in the orchard when Investigator Rubio was still investigating the incident. He testified that he had been at Mr. Armendariz-Hernandez's house when a car arrived and a woman got out and walked with Defendant in the direction of a nearby school. On cross-examination, Mr. Franco acknowledged that he could not give a description of the woman and that he had not

previously mentioned seeing the woman to Investigator Rubio. Mr. Franco also acknowledged that he had told Investigator Rubio during a taped statement that he, Mr. Franco, had "left early" on the night in question.

Defendant testified that on the night of the incident, he had gone outside to urinate and saw a car arrive. A woman got out and came toward him. Defendant testified that she invited him to walk, grabbed his hand, and was "doing weird stuff. . . . She looked drunk or on some substance. She looked strange, not just drunk." They sat down and the woman "started hugging and kissing" him. Defendant testified that she looked sexually excited and that she got on top of him and pulled his sweatpants down. He denied penetrating the woman and did not think he had become erect, but stated that it was possible he had ejaculated. According to Defendant, they were together for five or ten minutes, he told her to leave, and she returned to the car she had arrived in. Defendant said he then went into the house and went to sleep. He acknowledged that he did not tell Investigator Rubio about this encounter later that morning when the officer told Defendant that he was looking for a bag that a woman had lost just after midnight. Defendant also testified that he had told Investigator Rubio that he had gone away with his girlfriend the day before and was not present in the area at the relevant time.

The evidence before the jury satisfied both substantive elements of the charge of criminal sexual penetration, that Defendant had caused Victim to engage in sexual intercourse and had done so through the use of physical force or physical violence. Victim told the SANE nurse that sexual penetration had occurred, she told M.F., S.M., and Investigator Rubio that she had been raped, and she testified at trial that penetration had occurred. Defendant's semen was found inside her vagina. Victim testified, "I was trying to . . . get away with all of my strength, but [Defendant] had quite a firm grip on my wrist, so I couldn't really leave." M.F. and S.M. both testified that Victim was upset and crying upon her return to their home, a demeanor not consistent with a consensual sexual encounter. Deputy Telles, the responding officer, also described Victim as scared, crying, and very upset. Further, the jury could have found Defendant's description of the encounter to be implausible and incredible. *See Rojo*, 1999-NMSC-001, ¶ 19 (stating that "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts").

We acknowledge that there were some inconsistencies in the evidence, including Victim's initial statements to Deputy Telles and Investigator Rubio that she was not sure penetration had occurred. Taken as a whole, however, we conclude that there was sufficient evidence to allow the jury to find guilt beyond a reasonable doubt.

**CONCLUSION**

For the reasons stated in this Opinion, we affirm Defendant's conviction.

**IT IS SO ORDERED.**

_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**RODERICK T. KENNEDY, Judge**