2005-NMCA-121

121 P.3d 1050

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Shawna Michelle BRENN,
Defendant–Appellant.**

**No. 24,763.**

Court of Appeals of New Mexico.

Aug. 22, 2005.

Certiorari Denied, No. 29,440,
Oct. 10, 2005.

452

Patricia A. Madrid, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, for Appellee.

John Bigelow, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

WECHSLER, J.

{1} Defendant Shawna Brenn appeals her conviction for attempted trafficking in methamphetamine by manufacture, arguing that the evidence was insufficient to support her conviction because it did not indicate that she took any act to manufacture methamphetamine. Defendant had rented a hotel room in which she and another had large quantities of materials necessary to manufacture methamphetamine, some of which was unpackaged. We conclude that the evidence was sufficient to support the conclusion that Defendant had not merely engaged in preparation, but had taken a substantial step toward the manufacture of methamphetamine. As a result, we affirm Defendant's conviction for attempted manufacturing.

### Background

{2} Two New Mexico State Police Officers, Christina Madrigal and Eric Mendoza, narcotics agents, had learned that an unidentified male had purchased seven gallons of iodine from a local feed store in Clovis, New Mexico. The officers tracked the vehicle used by the purchaser of the iodine to a local motel where Defendant had rented a room. The vehicle, which was also rented to Defendant, was in the parking lot, and the officers saw a large amount of iodine in the back of the vehicle. The officers knocked on the motel room door and Defendant answered. The room was filled with smoke and contained two methamphetamine pipes. Defendant informed the officers that she and the other person in the room, a male named Rodriguez, were smoking methamphetamine when the officers arrived. After obtaining Defendant's consent to search the room, the officers found numerous items that testimony established to be essential ingredients in manufacturing methamphetamine.

{3} Defendant was charged with one count of attempted trafficking of methamphetamine by manufacture, one count of possession of methamphetamine, and one count of possession of drug paraphernalia. The possession of methamphetamine charge was dismissed before trial, and Defendant was tried and convicted on the other two charges. Defendant now appeals those convictions.

### Standard of Review

{4} When reviewing a claim of insufficiency of the evidence, we determine whether substantial evidence, either direct or circumstantial, exists to support a verdict of guilty beyond a reasonable doubt for every essential element of the crime at issue. *State v. Apodaca,* 118 N.M. 762, 766, 887

P.2d 756, 760 (1994). A sufficiency of the evidence review involves a two-step process. *Id.* at 766, 887 P.2d at 760. Initially, we view the evidence in the light most favorable to the verdict, resolving all conflicts and indulging all reasonable inferences in favor of the verdict. *Id.* "[T]hen we make a legal determination of whether the evidence viewed in this manner could justify a finding by [a] rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted); *cf. State v. Stettheimer*, 94 N.M. 149, 153–54, 607 P.2d 1167, 1171–72 (Ct.App.1980) (observing that although the defendant alleged insufficient evidence to constitute attempt, his allegation that there was no overt act in furtherance of the crime but instead merely preparation raises a legal issue). We do not reweigh the evidence or substitute our judgment for that of the factfinder. *State v. Mora*, 1997–NMSC–060, ¶ 27, 124 N.M. 346, 950 P.2d 789.

*Sufficiency of the Evidence*

■ {5} The felony of trafficking by manufacturing consists of "manufacture of any controlled substance enumerated in Schedules I through V or any controlled substance analog as defined in Subsection W of Section 30–31–2." NMSA 1978, § 30–31–20(A)(1) (1990). Methamphetamine is a Schedule II controlled substance. *See* NMSA 1978, § 30–31–7(A)(3)(c) (1979). "'[M]anufacture' means the production, preparation, compounding, conversion or processing of a controlled substance ...." NMSA 1978, § 30–31–2(M) (2002). The jury was instructed that, to convict Defendant of attempt to manufacture methamphetamine, it had to find beyond a reasonable doubt that Defendant intended to commit the crime of manufacturing methamphetamine and that she began to do an act which constituted a substantial part of the manufacturing but failed to commit the act of manufacturing. *See* UJI 14–2801 NMRA. The jury was also instructed that it could convict Defendant of attempt to manufacture under the theory of accessory liability if it found, beyond a reasonable doubt, that Defendant intended that the crime of manufacturing be committed, an attempt to commit the crime was committed, and Defendant helped, encouraged, or caused the attempt to commit the crime. *See* UJI 14–2820 NMRA.

{6} Defendant contends that her conviction for attempted manufacture of a controlled substance must be reversed because the State failed to show that Defendant did any actions in furtherance of the crime of manufacturing methamphetamine. She claims that the State failed to prove that she took even "one single step toward manufacturing methamphetamine, let alone an act that constituted a substantial part of manufacturing." She notes that the testimony at trial only indicated that Rodriguez purchased the iodine and that there was nothing to prove that Defendant "had anything to do with the various meth ingredients found in the motel room." We disagree.

{7} At trial, the officers testified in support of Defendant's conviction. Their testimony established that an unidentified male purchased nine gallons of iodine and drove away with seven gallons in a bright yellow Ford Escape. Madrigal testified that the purchase of such a large amount of iodine was suspicious and, based upon her training and experience, the purchaser of such a large quantity usually intended to use it to cook methamphetamine. Mendoza testified that he knew of no common use for that quantity of iodine. Both officers stated that iodine was a key ingredient in manufacturing methamphetamine.

{8} Madrigal testified that, after tracking the vehicle used by the purchaser of the iodine to the Motel 6 on Mabry Drive, she saw the yellow Ford Escape, which had been rented to Defendant, with a large amount of iodine stored in the back. The officers knocked on the door of the motel room registered to Defendant and Defendant answered. The room was filled with smoke and contained two methamphetamine pipes. Defendant admitted that she and Rodriguez were smoking methamphetamine when the officers arrived.

{9} The search of the motel room revealed over 5000 pseudoephedrine pills, a quart of acetone, scales, and an air purifier. Most of the pseudoephedrine pill boxes had

been opened and the pills removed from their blister packs. The loose pills were stored in a box on the floor of the motel room while the boxes of pills were found in a backpack.

{10} Mendoza testified that Defendant had told him that she had been using methamphetamine since the age of fourteen. She said that she and Rodriguez traveled to Clovis to purchase iodine because the price there, $25 per gallon, was much less than the price in Albuquerque, where iodine is sold for $125 per gallon. Defendant told Mendoza that she understood that iodine was used to manufacture methamphetamine and that she could make good money trading the iodine "to cooks or manufacturers of methamphetamine in Albuquerque."

{11} Testimony established that pseudoephedrine pills are cold and allergy pills which contain ephedrine, an essential ingredient in manufacturing methamphetamine. After testifying to his specialized training in methamphetamine labs, Mendoza testified that the acetone, iodine, and pseudoephedrine pills are the basis for manufacturing methamphetamine. He stated that ephedrine is a precursor to methamphetamine and explained that the types of chemicals found in the motel room are associated with the "red phosphorus" method of manufacturing, which requires combining ephedrine, iodine, and red phosphorus, which are then heated.

{12} Defendant testified. However, her testimony was neither internally consistent nor consistent with her earlier statements to the investigating officers. At trial, Defendant claimed that she did not know that the backpack contained pseudoephedrine pills, and she denied telling Mendoza that he would find pills in the room. She later admitted seeing the packaged pills in their boxes and admitted telling the officers that she knew about the blister packs of pseudoephedrine. She admitted telling the officers that she knew that iodine and ephedrine are key ingredients in manufacturing methamphetamine. However, she also claimed that she knew nothing about the technicalities for manufacturing methamphetamine.

{13} Defendant first denied knowing that Rodriguez was buying iodine and denied ever telling the officers that Rodriguez intended

to buy iodine or that she intended to resell iodine in Albuquerque. She then admitted that she told Mendoza that iodine could be sold for $125 per gallon in Albuquerque and admitted that she had told Mendoza that she was in Clovis to purchase iodine because it is cheaper. She explained the inconsistencies in her statements by claiming that she had only told Mendoza about the cheaper iodine because she assumed Rodriguez would resell the iodine once she saw the receipt for the iodine after Rodriguez returned to the room. She admitted telling the officers that she started using methamphetamine at age fourteen, but claimed that this was a lie and that she had only been regularly using methamphetamine for about a year. She claimed that she had no idea that she was going to Clovis when she left Albuquerque with Rodriguez and denied renting the vehicle.

 {14} We now consider whether the evidence reviewed above is sufficient to support Defendant's conviction for attempt to manufacture methamphetamine. In order to be guilty of the crime of attempt to manufacture methamphetamine, Defendant must commit an overt act in furtherance of the crime of manufacturing and that act must be "more than mere preparation." *State v. Green*, 116 N.M. 273, 280, 861 P.2d 954, 961 (1993); *see* NMSA 1978, § 30–28–1 (1963) (defining the crime of attempt as "an overt act in furtherance of and with intent to commit [the] felony and tending but failing to effect its commission"). However, even "slight acts in furtherance [of the crime] will constitute an attempt." *Stettheimer*, 94 N.M. at 153–54, 607 P.2d at 1171–72 (internal quotation marks and citation omitted).

{15} Defendant's actions in possessing over 5000 pseudoephedrine pills, most of which were unpackaged, together with acetone and iodine, are sufficient to establish the requisite overt act for attempt. The jury could infer that Defendant was attempting to manufacture methamphetamine because there is no legal purpose for Defendant to possess such a large amount of pseudoephedrine and iodine. *See United States v. Haynes*, 372 F.3d 1164, 1169 (10th Cir.2004) (holding that the defendant's possession of "P2P," known to be useful in the manufac-

ture of methamphetamine and also known to have no purpose other than to aid in manufacture, together with the possession of other items that can be used for manufacture, "was ample evidence for a reasonable jury to conclude beyond a reasonable doubt that [the][d]efendant had taken a substantial step in the manufacture of methamphetamine"); *cf.* Model Penal Code § 5.01(2)(f) (1985) (specifying actions that are not insufficient as a matter of law to establish a substantial step toward commission of the underlying offense and including "possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances").

{16} In light of Defendant's failure to adequately explain the large amount of unpackaged pseudoephedrine, the jury could disbelieve Defendant's explanation that the iodine was purchased for resale. *See United States v. Becker,* 230 F.3d 1224, 1234 (10th Cir.2000) (holding that the defendant's possession of a recipe and some ingredients for the "hot" method of manufacturing methamphetamine, some ingredients for the "cold" method of manufacturing, and materials that were inconsistent with the defendant's explanation was sufficient to convict the defendant of attempt to manufacture methamphetamine). It would be reasonable for the jury to doubt Defendant's explanation about the iodine because her stated intention to resell is not consistent with the possession of over 5000 pseudoephedrine pills, and her explanation and statements at trial were inconsistent with her earlier statements to Mendoza. *See United States v. Smith,* 264 F.3d 1012, 1017 (10th Cir.2001) (holding that it was reasonable for the district court to reject the defendant's contention that he was making pure pseudoephedrine to sell to another manufacturer of methamphetamine and noting that the receipt for fuel, which is used at the end of the manufacturing process, cast doubt on the defendant's claim).

{17} Defendant also contends that there was no evidence from which the jury could reasonably infer that Defendant participated in obtaining the unpackaged pseudoephedrine pills and the iodine. We disagree. Based upon circumstantial evidence, the jury could infer that Defendant, despite her claims to the contrary, had knowledge of the presence of, and possessed control over, the unpackaged drugs and the iodine. *See State v. Phillips,* 2000–NMCA–028, ¶ 8, 128 N.M. 777, 999 P.2d 421 (stating that, even if the defendant was not in exclusive possession of the premises where contraband is located, the "accused's own conduct may afford sufficient additional circumstances" from which the jury can infer knowledge and control over the materials in the room). Defendant's statement to Mendoza that the officers "might" find a small amount of methamphetamine and a "few" pills in the room indicates that she knew of the pills. Furthermore, the opened, unpackaged pills were in a box on the floor near the bathroom. In light of the placement of the pills in plain view, the jury was free to disbelieve Defendant's claim that she never saw the pills because she never used the bathroom. *Id.* ¶ 11 (stating that the jury was free to discredit the defendant's claim that she " 'hardly ever looked in the [dresser] drawer' " where the contraband was found and that the jury "could rationally have concluded that [the] [d]efendant was well aware of the dresser's contents and shared it with [another]") (first alteration in original).

{18} Mendoza also testified that Defendant told him about the iodine, although at trial Defendant attempted to downplay her professed knowledge by offering a different explanation for her statement to Mendoza. The jury was free to reject Defendant's explanation that she only became aware of the iodine when she saw the receipt for its purchase. *See State v. Coffin,* 1999–NMSC–038, ¶ 77, 128 N.M. 192, 991 P.2d 477 (observing that the jury was free "to reject [the defendant's] explanation of his actions and to draw its own inferences based on the evidence"). The jury could infer from her inconsistent statements regarding her knowledge of the pseudoephedrine pills and iodine that Defendant knew more about the materials than she was admitting. *See Phillips,* 2000–NMCA–028, ¶ 12, 128 N.M. 777, 999 P.2d 421 (holding that the jury could have seen the defendant's

denials to be contrived and concluded that she knew more than she acknowledged about the contraband seized from the room she shared with her boyfriend based upon her earlier statements admitting that she knew of the contraband, her concession that she had used drugs in the past, and her statement to police that she " 'thought that in order to be charged with possession [of drugs], you actually had to have it on you.' ") (alteration in original).

{19} Based upon the foregoing, there was sufficient circumstantial evidence to allow the jury to find that Defendant knew of, and possessed, the pseudoephedrine pills, acetone, and iodine. *See State v. Chandler*, 119 N.M. 727, 731, 895 P.2d 249, 253 (Ct.App. 1995) (holding that jury members are free to "use their common sense to look through testimony and draw inferences from all the surrounding circumstances") (internal quotation marks and citation omitted). Defendant's claim that the pseudoephedrine, acetone, and iodine belonged to Rodriguez to divest herself of possession and control over the materials "may have some force as an abstract proposition; but the jury [was] free to find to the contrary on the evidence here." *Id.* at 731, 895 P.2d at 253 (internal quotation marks and citation omitted).

{20} Defendant also claims that, even if the jury could conclude that she unpackaged the pills, this action does not constitute a substantial part of manufacturing as required for the crime of attempt. She references Mendoza's explanation of the steps necessary to manufacture methamphetamine as support for her argument that unpackaging is not a substantial step. She also relies on the distinction between pseudoephedrine and ephedrine and notes that only the latter is an immediate precursor for methamphetamine. She argues that, given Mendoza's testimony as to the steps in manufacturing, even if the jury was allowed to infer that Defendant had removed the pseudoephedrine pills from the blister packs, such unpackaging is only a preparatory step which is not the requisite substantial step necessary for an attempt conviction. We disagree.

{21} Mendoza's testimony shows that the very first essential step in manufacturing methamphetamine is to separate the ephedrine from its base in the pseudoephedrine pills. "This act is more than mere preparation" and stands as the first step "in a direct movement toward the commission of the offense after the preparation ... is made." *Green*, 116 N.M. at 283, 861 P.2d at 964 (internal quotation marks and citation omitted). Therefore, the unpackaging, coupled with Defendant's actions in helping to obtain the iodine and acetone and renting the motel room and car, is sufficient evidence of a substantial step toward the manufacturing of methamphetamine.

{22} We are also unpersuaded by Defendant's contention that her actions cannot constitute a substantial step because the search did not uncover all of the materials necessary to initiate manufacturing and because methamphetamine could not be manufactured with the materials present in the motel room. Defendant is correct that all of the materials necessary to manufacture methamphetamine were not present in the motel room; the officers failed to find any heat source, beakers, or burners. However, we are unpersuaded that this lack of materials warrants reversal. Instead, we agree with the holding of the Court in *Smith* that a defendant need not have "a full 'working lab' " to be convicted of attempt to manufacture methamphetamine. *Smith*, 264 F.3d at 1016.

{23} We recognize that the dividing line between attempt and preparation is not always clear and is heavily dependent upon the surrounding factual circumstances. *Stettheimer*, 94 N.M. at 154, 607 P.2d at 1172; *see also Smith*, 264 F.3d at 1016. However, the circumstantial evidence in this case is more than sufficient for the jury to draw reasonable inferences that Defendant committed an overt act in furtherance of the crime of manufacturing methamphetamine. *See Becker*, 230 F.3d at 1234. In addition to obtaining and possessing suspiciously large amounts of pseudoephedrine and iodine, Defendant's overt acts include renting a car to travel to Clovis to obtain inexpensive iodine, renting a motel room where unpackaged pseudoephedrine was stored, and admittedly

smoking methamphetamine in a room containing over 5000 pseudoephedrine pills, scales, and acetone—materials necessary to manufacture methamphetamine. These actions are sufficient to constitute an overt act in furtherance of the manufacture of methamphetamine. *See United States v. Jessup,* 305 F.3d 300, 303 (5th Cir.2002) (rejecting the defendant's challenge to the sufficiency of the evidence and holding that "[t]he affirmative act of collecting a substantial part of the equipment and ingredients for manufacturing methamphetamine can constitute action beyond 'mere preparation' sufficient to constitute a substantial step"); *State v. Sheikh,* 30 Kan.App.2d 188, 41 P.3d 290, 291–93 (2001) (reversing the dismissal of the attempt to manufacture charge based on the defendant's overt actions in removing approximately 672 pseudoephedrine tablets from their blister packs and putting the pills, along with other items used in manufacturing methamphetamine and a handgun, in the defendant's vehicle and the defendant's admission that he was intending to drive to another location to cook methamphetamine).

{24} Furthermore, we disagree with Defendant's contention that the evidence is insufficient to establish the requisite intent to manufacture methamphetamine. Intent is usually established by circumstantial evidence. *See State v. Gallegos,* 109 N.M. 55, 66, 781 P.2d 783, 794 (Ct.App.1989) (stating that intent is usually inferred from the facts of the case, not direct evidence); *State v. Gregg,* 83 N.M. 397, 399, 492 P.2d 1260, 1262 (Ct.App.1972) (holding that there was substantial evidence of the defendant's fraudulent intent even though the evidence was circumstantial). Defendant's actions in renting a car to travel to Clovis to obtain relatively inexpensive iodine, renting a motel room where unpackaged pseudoephedrine was stored, admittedly smoking methamphetamine in a room containing over 5000 pseudoephedrine pills, scales, and acetone, and providing inconsistent statements to the investigating officers are sufficient circumstantial evidence of her intent to manufacture methamphetamine.

{25} Finally, even in the absence of any evidence directly connecting Defendant to the opening of the pseudoephedrine blister packs, or directly connecting her to the purchase of the iodine, there is sufficient evidence to convict Defendant under a theory of accomplice liability. *See State v. Carrasco,* 1997–NMSC–047, ¶ 6, 124 N.M. 64, 946 P.2d 1075 (noting that accessory liability is equal to that of the principal); *see also State v. Bankert,* 117 N.M. 614, 619–20, 875 P.2d 370, 375–76 (1994) (affirming the defendant's conviction for trafficking cocaine by possession with intent to distribute based upon evidence showing that the defendant's accomplice engaged in the possession with intent to distribute because, even though the defendant "never touched the cocaine and was often not in the same room where the drug deal took place," because the defendant's actions as "financier of the endeavor" and transporter by way of his personal vehicle sufficiently demonstrated accomplice status). The jury could infer from Defendant's behavior in smoking methamphetamine, furnishing the car and the room, and providing inconsistent statements about her knowledge of the iodine and the amount of the pseudoephedrine tablets, that she was helping, encouraging, or causing the attempt to manufacture.

{26} Moreover, this same evidence is sufficient to establish that Defendant had the requisite intent to commit trafficking by manufacturing, which is necessary to convict Defendant as an accessory. *See Carrasco,* 1997–NMSC–047, ¶ 7, 124 N.M. 64, 946 P.2d 1075 (observing that an accessory's intent may be established by inference from the surrounding facts and circumstances and stating that "intent can be inferred from behavior which encourages the act"); *cf. Bankert,* 117 N.M. at 619, 875 P.2d at 375 (indicating that intent may be proven "by inference from the surrounding facts and circumstances") (internal quotation marks and citation omitted). The evidence "is not so thin that we can say as a matter of law that *no* rational jury could find the required facts to support [a] conviction." *Carrasco,* 1997–NMSC–047, ¶ 14, 124 N.M. 64, 946 P.2d 1075.

*Conclusion*

{27} Having reviewed the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to support Defendant's conviction for attempted trafficking in methamphetamine by manufacture beyond a reasonable doubt. We affirm Defendant's convictions.

{28} **IT IS SO ORDERED.**

PICKARD and CASTILLO, JJ., concur.