2007-NMCA-083

164 P.3d 102

STATE of New Mexico,
Plaintiff–Appellee,

v.

Robert MONTES, Defendant–Appellant.

No. 25,883.

Court of Appeals of New Mexico.

June 6, 2007.

methamphetamine in a school zone. He challenges the admission on cross-examination of evidence that he had distributed drugs on prior occasions and also contends that his convictions were not based on sufficient evidence. We reverse the trial court's admission of the prosecutor's questions of Defendant on cross-examination, and, because we hold there was sufficient evidence on both convictions, we remand for a new trial.

## BACKGROUND

{2} On March 31, 2004, four New Mexico State Police officers were working undercover in Las Cruces, New Mexico. Two of the officers, Agents Hartranft and Coburn, posing as construction workers who periodically worked on projects in town, came in contact with Brenda Bustamante at a gas station. The agents knew Bustamante from previous occasions when they relied on her as an "unwitting informant;" that is, she was the "go-between" person who arranged drug transactions without knowing she was dealing with police. There were also two agents serving as backup to Agents Hartranft and Coburn who were conducting mobile surveillance.

{3} On the night in question, Agents Hartranft and Coburn inquired whether Bustamante could get them some methamphetamine. Bustamante said that she could not, but she introduced them to her companion that evening, Apple Davis, as someone from whom the officers could arrange to purchase methamphetamine. Davis testified that she eventually met up with Sammy Meraz, who told Davis that he could find her drugs. Davis testified that she and Meraz left the officers and Bustamante to go to Defendant's parents' house and arranged to meet the officers at Sierra Middle School. At Defendant's parents' house, Davis testified that she stayed in the car while Meraz approached Defendant, who was outside working on his car. She testified that Defendant and Meraz walked back to the car where Davis was waiting and, while in her presence, Defendant stated "$100," which Davis understood to mean that the price of drugs was $100 per gram. Davis testified that she and Meraz then left Defendant's house to meet the officers to confirm that the price was acceptable.

Gary K. King, Attorney General, Santa Fe, NM, Steven S. Suttle, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Kathleen T. Baldridge, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

FRY, Judge.

{1} Defendant appeals his convictions for distribution of and conspiracy to distribute

Davis testified that after confirming the price was acceptable, she and Meraz returned to Defendant's mother's house for a second time. Davis remained in the car while Meraz got out of the car and knocked on the door and Defendant came out of the house. Davis testified that she did not hear any of the conversation between Defendant and Meraz, nor did she watch the two men when they were talking to each other. Davis also testified that she did not see Defendant give Meraz drugs or Meraz give Defendant money. But Davis did testify that she and Meraz then went to the middle school and gave the drugs, 1.78 grams of methamphetamine, to the officers.

{4} Defendant testified at trial that on March 31, 2004, he was visiting his mother at her house and was outside by his car when Meraz and Davis drove up and called him over to Davis's car. Defendant testified that they asked him where they could purchase methamphetamine and that he told them he did not know. Defendant testified that Meraz got out of the car, followed Defendant up to his car, and inquired again about where Meraz could get drugs. Defendant said that he again told Meraz that he did not know. Defendant admitted that he used cocaine and methamphetamine, but he denied manufacturing, selling, or dealing drugs.

## DISCUSSION

{5} Defendant makes two arguments on appeal. First, he contends that the form of the prosecutor's questioning of Defendant on cross-examination was improper impeachment and violated Defendant's right to confrontation. Second, Defendant argues that there was insufficient evidence to convict him on the charges of distribution of methamphetamine in a school zone and conspiracy to do the same. We address each argument in turn and provide more facts as needed.

## I. Evidentiary Issues

{6} During the State's case in chief, Davis testified that she knew Defendant "as a person who could sell or give away methamphetamine." Defendant objected to this questioning of Davis because it went beyond the scope of the alleged incident and because its prejudicial effect outweighed its probative value. The State responded that Davis's testimony explained how Davis knew Defendant. The trial court overruled Defendant's objection. Later, during Defendant's case in chief, Defendant testified that he was a drug user, but he denied manufacturing or dealing drugs. Then, on cross-examination, the prosecutor asked Defendant the following question: "[B]ack in July of 2003, [if] Cecilia Mata referred to you as her source [for buying drugs], she would just be wrong?" At that point, defense counsel objected and the following conversation occurred at the bench outside the hearing of the jury:

[Defense Counsel]: I object to this line of questioning. In particular, since he is citing to people who are not present in the courtroom who can testify under oath in front of the jury.... None of them are present in the court. So I think, certainly, it violates his right to confrontation. Obviously, I can't really impeach his statement.

. . . .

[Prosecutor]: Your Honor, I think all the statements are to the undercover officers[;] therefore it is in furtherance of the conspiracy naming this defendant. I think also the defense kicked the door wide open by saying he is known in the community as a drug user, not as a drug dealer. I think they opened it to this line of cross-examination.

The Court: Well, for impeachment purposes you opened the door, [defense counsel]. I am going to allow the questions, but no extrinsic evidence. He either denies it or admits them.

The prosecutor proceeded to ask Defendant, using the same or similar form of question, whether he "would be surprised" that Claudia Padilla, Brenda Bustamante, Anna Tellez, Hope Tellez, and Albert "Birdie" Jimenez had all referred to Defendant as their source for drugs.

{7} On appeal, Defendant challenges the trial court's decision allowing the State to question Defendant as it did. Defendant claims that the prosecutor's questions contained inadmissible hearsay and violated Defendant's confrontation rights, that the questions were improper for the purposes of

impeachment, and that the questions amounted to impermissible character evidence. The State responds that the evidentiary rules relied on by Defendant do not apply to questions posed on cross-examination, and that the questions were appropriate to rebut Defendant's testimony that he was not a drug dealer.

{8} Generally, this Court reviews a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Elinski,* 1997–NMCA–117, ¶ 8, 124 N.M. 261, 948 P.2d 1209. We conduct a de novo review of the application of the law to the facts. *Id.*

### A. The Trial Court Erred in Allowing the Prosecutor to Cross–Examine Defendant Using Hearsay Testimony

{9} The trial court permitted the prosecutor's questions "for impeachment purposes." Our Supreme Court has held that it is improper to impeach a defendant with hearsay evidence under some circumstances. *State v. McClaugherty,* 2003–NMSC–006, ¶¶ 19–20, 30, 133 N.M. 459, 64 P.3d 486. Therefore, we first consider whether the prosecutor's questions constituted hearsay.

{10} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 11–801(C) NMRA. Rule 11–802 NMRA prohibits the admission of hearsay evidence with certain exceptions provided for in the rules. We conclude that the statements made by the five out-of-court declarants, which were embedded in the prosecutor's questions, were hearsay. They were offered for the purpose of establishing that Defendant had indeed distributed drugs on previous occasions. The impeachment value of the prosecutor's questions turned on the jury's belief of the truth of the out-of-court statements to which the prosecutor referred. Thus, even assuming the prosecutor asked the questions to impeach Defendant, the questions also had the substantive purpose of proving that Defendant had distributed the drugs on prior occasions.

{11} Because the statements were offered to prove the truth of the matter assert-ed, they would be admissible only if the statements fit within an exception to the hearsay rule or were specifically designated as "non-hearsay" under Rule 11–801(D)(2). The State relied on Rule 11–801(D)(2)(e), which provides that "[a] statement is *not* hearsay if: [t]he statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." (Emphasis added.) We will refer to this as the co-conspirator's rule. The co-conspirator's rule requires the proponent of the evidence to demonstrate: (1) The existence of a conspiracy of which the declarant and the defendant were members, (2) that the statement was made in the course of that conspiracy, and (3) that the statement was made in furtherance of that conspiracy. 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.34[3], 77 (2d ed.2007). For the co-conspirator's rule to apply, our Court requires a "sufficient foundation" establishing the existence of a conspiracy and that the co-conspirator's acts and statements were made in furtherance of the conspiracy. *See State v. Farris,* 81 N.M. 589, 589, 470 P.2d 561, 561 (Ct.App.1970).

{12} The State failed to lay the required foundation for the applicability of the co-conspirator's rule. There is nothing in the record from which the trial court could determine whether there was a conspiracy of which Defendant and the declarants were members, whether the statements were made in the course of such a conspiracy, or whether the statements were in furtherance of such a conspiracy. Therefore, there was no basis for the co-conspirator's rule to apply and it was error to allow the prosecutor to include the hearsay statements in his cross-examination.

{13} Interestingly, on appeal the State does not argue the co-conspirator rule as a basis for the admission of the statements. Rather, it relies exclusively on the argument that the statements were used for impeachment and were therefore admissible. However, as we have discussed, the hearsay problem is evident and cannot be ignored.

{14} We are not persuaded by the State's argument that the prosecutor's questions were admissible as impeachment. The State contends the statements did not constitute "evidence" because they were not "presented to the jury." The State contends that the "principles enunciated [in Rules 11-404(B) NMRA, -801] apply only to evidence actually admitted before a jury and not to questions posed on cross-examination." (Emphasis omitted.) We disagree. The State's form of questioning Defendant *implied* that it had substantive evidence that Defendant in fact sold or distributed drugs to the six people that the prosecutor named in the questions.

{15} The circumstances in the present case are similar to those in *McClaugherty*. In that case, the defendant, who was facing murder charges, testified and denied shooting the victim. 2003-NMSC-006, ¶ 10, 133 N.M. 459, 64 P.3d 486. The state, on cross-examination, attempted to impeach the defendant with statements apparently made by the defendant's sister and his roommate. *Id.* ¶ 11. At first, the state asked the defendant what he had told his sister and his roommate, and when the defendant responded that he told his sister and roommate that he had run away, the prosecutor suggested that he had statements given by the sister and the roommate. *Id.* The prosecutor then asked the defendant the following: "[W]ould it surprise you to hear that your sister ... gave a statement to the police ... that you admitted to her that you shot[?]" *Id.* ¶ 13. Our Supreme Court held that the questions were impermissible, reasoning that even though the prosecutor intended to impeach the defendant, the questions also "served the substantive purpose of proving [the d]efendant had admitted guilt." *Id.* ¶ 25.

{16} Similarly, in this case, the questions the prosecutor asked of Defendant implied that the State had evidence that Defendant engaged in acts of selling drugs on prior occasions. That evidence, purportedly used to impeach Defendant's credibility, also had the purpose of introducing evidence that Defendant had acted, at least *six times*, in a manner consistent with the present charges; that is, that Defendant had distributed drugs

to six other people. As the Court noted in *McClaugherty*, the prosecutor's questions "appear[ed] to assume a fact on which the jury could rely. That fact, however, was not properly in evidence." *Id.*

{17} We find further support for our holding in *United States v. Hall*, 989 F.2d 711, 713 (4th Cir.1993). *See State v. Lopez*, 1997-NMCA-075, ¶ 10, 123 N.M. 599, 943 P.2d 1052 (noting that because Rule 11-801 is identical to its federal counterpart, federal case law is instructive in interpreting the state rule). In *Hall*, the Fourth Circuit Court of Appeals reversed the defendant's convictions for distribution of drugs and conspiracy to do the same based on improper cross-examination of the defendant at trial. *Id.* at 717. In *Hall*, the prosecutor asked the defendant multiple questions based on a statement given by the defendant's wife, in which the wife recounted instances of the defendant's drug use and drug dealings. *Id.* at 715. The defendant's wife did not testify because she asserted spousal privilege. *Id.* at 716. In holding that the government's use of the wife's statement was inadmissible hearsay, the Fourth Circuit emphasized that "[p]rotections against the use of privileged and inadmissible evidence would be of little benefit if the prosecutor were allowed, under the guise of 'artful cross-examination,' to tell the jury the substance of inadmissible evidence." *Id.* (citation omitted). Furthermore, the court recognized that while a defendant is obliged to testify honestly, even if the prosecution believes that the defendant is lying, its impeachment techniques "are constrained by the requirements of the Confrontation Clause." *Id.* at n. 10. Ultimately, the Fourth Circuit held that the government's cross-examination of the defendant at trial was an "egregious example" of the prosecution presenting otherwise inadmissible evidence through the "back door," and presenting highly prejudicial testimony that the defendant could not cross-examine. *Id.* at 716-17.

{18} The facts of this case are strikingly similar to those of *Hall*. Like the defendant in *Hall* whose wife did not testify, Defendant in this case was cross-examined using the statements of six people who did not testify.

Defendant had no chance to cross-examine their statements. Also like *Hall,* the hearsay testimony in this case presented evidence to the jury that Defendant had engaged in distributing and using drugs on previous occasions, and such actions were identical to the charges that Defendant faced. The prosecutor's questions in this case demonstrate the "artful cross-examination" that the Fourth Circuit in *Hall* denounced because the questioning allowed otherwise inadmissible evidence to be heard by the jury through the "back door." *Id.* The State in this case had the right to inquire, on cross-examination, whether Defendant had ever distributed drugs on previous occasions, but it was constrained by the rules of evidence as to the manner in which it sought to impeach Defendant.

{19} We hold that the State's use of the six out-of-court statements by declarants who did not testify at trial about Defendant's prior acts of distributing drugs was improper. Because we hold that the trial court misapplied the law regarding hearsay and impeachment, we do not address Defendant's argument that his confrontation rights were violated. *See State v. Rendleman,* 2003–NMCA–150, ¶ 37, 134 N.M. 744, 82 P.3d 554 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so." (internal quotation marks and citation omitted)). We also do not address Defendant's argument that the prosecutor's questions constituted improper character evidence. However, we note that the proper inquiry for a trial court to conduct when deciding whether to admit evidence that a defendant had engaged in the same conduct for which the defendant is currently being tried is well established under New Mexico law. *See State v. Jones,* 120 N.M. 185, 186, 899 P.2d 1139, 1140 (Ct.App.1995) (outlining the trial court's inquiry when considering evidence under Rule 11–404); *State v. Robinson,* 99 N.M. 674, 676, 662 P.2d 1341, 1343 (1983) (discussing Rule 11–608 NMRA and the trial court's role in considering evidence of prior acts for impeachment purposes).

## B. The Prosecutor's Questions of Defendant Were Not Harmless Error

{20} Having determined that the trial court erred in admitting the prosecutor's questions, we consider whether the admission of the questions constituted harmless error. The admission of evidence is not harmless when "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Clark v. State,* 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991). As our Supreme Court noted in *Clark,* the erroneous admission of evidence that is used for impeachment purposes has two impacts. The error permits the jury to consider the substantive effect of the evidence itself and it discredits the testimony of the witness being impeached. Both effects must be considered in determining whether the error was harmless. *Id.* at 487–88, 816 P.2d at 1109–10.

{21} We find the facts of *Clark* particularly analogous to this case. In *Clark,* our Supreme Court held that it was not harmless error when the trial court allowed the prosecutor to cross-examine the defendant's brother, who testified in his brother's defense at trial, about prior offenses. *Id.* at 486, 816 P.2d at 1108. In so holding, the Court noted that the evidence the prosecutor used to impeach the defendant's brother suggested that the brother had been involved in activities like the illegal conduct with which the defendant was charged. Thus, because the brother was with the defendant at the time of the alleged offenses, the jury might have viewed the defendant in an unfavorable light. *Id.* at 488, 816 P.2d at 1110. In addition, "the improper impeachment undermined the credibility of [the brother's] testimony, which tended to exonerate [the] defendant." *Id.*

{22} In this case, there was a reasonable probability that the evidence introduced on cross-examination by the State contributed to Defendant's convictions. As in *Clark,* the prosecutor's questions were used both as improper impeachment and as independent substantive evidence, and the jury's verdict could have been affected by both. The State's questions of Defendant implied that the State had evidence of, and that Defendant had committed, six prior acts of selling

drugs—evidence that Defendant had engaged in the same illegal conduct with which he was charged at trial. This evidence reasonably could have planted the idea in the minds of the jurors that Defendant had committed acts of selling drugs on prior occasions, and, therefore, that he did the same act of selling drugs on this occasion. Additionally, the prosecutor's questions were intended to attack Defendant's credibility by catching him in a lie. Defendant, the only defense witness, contradicted the facts as testified to by the State's main witness, Davis.

{23} We cannot say that there is no reasonable possibility that the improper impeachment and hearsay evidence did not contribute to Defendant's convictions. Rather, in light of the fact that the State's case in chief presented only circumstantial evidence of Defendant's guilt, the improper admission of the State's questions is all the more prejudicial. Because we conclude that the trial court's admission of the prosecutor's questions was prejudicial error, we reverse his convictions.

## II.  Sufficiency of the Evidence

{24} We turn now to Defendant's contention that the State failed to present sufficient evidence to support his convictions. We address this argument because Defendant would be entitled to dismissal, instead of retrial, if the evidence at trial were insufficient to support his convictions. *State v. Jojola*, 2005–NMCA–119, ¶ 2, 138 N.M. 459, 122 P.3d 43, *aff'd by* 2006–NMSC–048, 140 N.M. 660, 146 P.3d 305.

{25} Defendant was convicted of distribution of methamphetamine in a drug-free school zone, in violation of NMSA 1978, § 30–31–20(C) (2006), and conspiracy to do the same, in violation of NMSA 1978, § 30–28–2 (1979). Conviction of distribution of methamphetamine under Section 30–31–20(B)(1) for a first offender is normally a second degree felony. Subsection C of that statute enhances the crime to a first degree felony for "[a] person who knowingly violates Subsection B of this section within a drug-free school zone." § 30–31–20(C). Defendant specifically argues that the State failed

to show that he distributed and conspired to distribute the drugs within a drug-free school zone.

{26} We review a claim of insufficient evidence in a light most favorable to the State to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We do not substitute our judgment for that of the jury or reweigh the evidence. *Id.* The sufficiency of the evidence is measured against the instructions given to the jury, which are the law of the case. *State v. Schackow*, 2006–NMCA–123, ¶ 8, 140 N.M. 506, 143 P.3d 745.

{27} With respect to the charge of distribution, the trial court instructed the jury on two theories under which the jury could convict Defendant: liability as a principal, and liability as an accomplice. We address each theory in turn.

### A.  Liability of a Principal

{28} On the theory of liability as a principal, the trial court instructed the jury that, in order to convict Defendant of distribution of methamphetamine in a drug-free school zone, it had to find beyond a reasonable doubt that: "[D]efendant transferred or caused the transfer of methamphetamine to another[,][D]efendant knew it was methamphetamine[, and] [t]he transfer occurred in a drug[-]free school zone." UJI 14–3103 NMRA. Defendant contends there was insufficient evidence presented that he transferred drugs to anyone and that he transferred drugs in a drug-free school zone.

{29} In order for liability as a principal to attach, the transfer had to occur in a drug-free school zone. Because Defendant was not present in the school parking lot where the actual transfer took place, he could be liable as a principal only if he *caused* the transfer that took place in the school parking lot. Thus, the transfer in question was the transfer of drugs to the officers, not the transfer of drugs to Meraz and Davis.

{30} The State introduced evidence that Defendant quoted a price for methamphetamine to Meraz and Davis, that Meraz and Davis left Defendant and then returned to Defendant's mother's house. While Davis did not see Defendant give drugs to Meraz or Meraz give money to Defendant, when she and Davis then went to the school parking lot where the officers were waiting, Meraz gave drugs to the officers. It would be reasonable for the jury to infer that Defendant knew Meraz and Davis were acting as go-betweens in the drug purchase, and that Defendant therefore caused the transfer of the methamphetamine to the officers; however, it would also be reasonable for the jury to conclude that Defendant did not know that Meraz and Davis were purchasing drugs for anyone other than themselves. Nonetheless, we resolve all conflicts in the evidence and indulge all reasonable inferences in favor of the verdict. *State v. Apodaca,* 118 N.M. 762, 765–66, 887 P.2d 756, 759–60 (1994). We therefore conclude there was sufficient evidence to convict Defendant of causing the transfer of methamphetamine in a drug-free school zone. As we discuss in more detail below, the jury instruction on principal liability did not require the jury to find that Defendant *knew* the transfer took place in a drug-free school zone.

## B. Accomplice Liability

{31} Even if the evidence were insufficient to support Defendant's liability as a principal, it was sufficient to support his conviction as an accomplice. *Cf. State v. Olguin,* 120 N.M. 740, 741, 906 P.2d 731, 732 (1995) (explaining that a general verdict of guilt need not be set aside "if an alternative basis of conviction is only factually[, as opposed to legally,] inadequate to support a conviction"). The trial court instructed the jury on accomplice liability as follows:

[D]efendant may be found guilty of a crime even though he himself did not do the acts constituting the crime, if the [S]tate proves to your satisfaction beyond a reasonable doubt that:

1. [D]efendant intended that the crime be committed;

2. The crime was committed; [and]

3. [D]efendant helped, encouraged or caused the crime to be committed.

*See* UJI 14–2822 NMRA. Defendant argues that the State did not present evidence regarding his intent that the transfer occur in a drug-free school zone.

{32} Under a theory of accomplice liability, "[a] person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime." NMSA 1978, § 30–1–13 (1972). The "accessory must share the criminal intent of the principal." *State v. Carrasco,* 1997–NMSC–047, ¶ 7, 124 N.M. 64, 946 P.2d 1075.

{33} Defendant argues that he lacked the specific intent that the transfer of drugs occur in a drug-free school zone under a theory of accomplice liability. However, under the instruction on principal liability, the principal did not have to have the specific intent that the transfer of drugs occur in a drug-free school zone. The instruction required that, in order to be convicted of principal liability, Defendant had to have knowledge that the substance was methamphetamine, but the instruction did not attach any particular mental state or intent with respect to the occurrence of the actual transfer within the school zone. Because an accomplice must have the same intent as the principal, and because the applicable jury instruction did not require the principal to have any intent or knowledge that the transfer take place in a drug-free school zone, the accomplice did not have to have such knowledge or intent.

{34} If Defendant intended to argue that knowledge or intent of the location of transfer is an essential element of principal liability for this enhanced crime and that the jury should have been instructed accordingly, he has not clearly made that argument on appeal, and he did not make that argument below. We express no opinion on this issue. *See Clayton v. Trotter,* 110 N.M. 369, 373, 796 P.2d 262, 266 (Ct.App.1990) (explaining that an appellate court need not consider unclear arguments). We leave for another day the question whether the crime of distri-

bution in a drug-free school zone requires a mental state regarding the location of distribution. *See* § 30–31–20(C) (stating that a person is guilty of the enhanced distribution crime if the person "knowingly violates Subsection B of this section[, which proscribes intentional trafficking of controlled substances,] within a drug-free school zone").

{35} Having determined that, under the instructions given, the State did not have to present evidence of Defendant's intent for the transfer to occur in a drug-free school zone, we turn to the question of whether sufficient evidence was presented to the jury to support Defendant's conviction for accomplice liability.

{36} The State presented evidence at trial, by way of Davis's testimony, that the transfer of methamphetamine occurred and that Defendant transferred the drugs to Davis and/or Meraz. Davis testified that she asked Defendant "how much it was going to be and he said $100 a gram." She testified that she then said to Defendant that she "[had] to run back to Sierra Middle School." This testimony, along with the evidence that Davis and Meraz ultimately returned to Defendant to purchase the drugs, is evidence that supports the State's theory that Defendant knew that Davis and Meraz were acting as the go-betweens for the ultimate purchaser. Based on this circumstantial evidence, the jury could infer that Defendant intended the crime to be committed. We hold that the State presented sufficient evidence to support Defendant's conviction of distribution under a theory of accomplice liability.

## C. Conspiracy

{37} We now turn to whether the State presented sufficient evidence to support Defendant's conviction based on conspiracy to commit distribution of methamphetamine in a drug-free school zone. The trial court instructed the jury that to find Defendant guilty of the conspiracy charge it had to find that: "[D]efendant and another person by words or acts agreed together to commit distribution of methamphetamine[, and] [D]efendant and the other person *intended* to commit distribution of methamphetamine in a

drug-free school zone[.]" UJI 14–2810 NMRA (emphasis added).

{38} Because of the way the conspiracy instruction is worded, the issue on the conspiracy conviction turns on whether there was any evidence, direct or circumstantial, that Defendant intended to distribute the drugs in the drug-free school zone. *See Schackow*, 2006–NMCA–123, ¶ 8, 140 N.M. 506, 143 P.3d 745 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)). This is in contrast to the instruction on principal liability for distribution in a drug-free school zone, because the instruction for that crime did not include an element of knowledge or intent regarding the location of distribution. "Intent is usually established by circumstantial evidence." *State v. Brenn*, 2005–NMCA–121, ¶ 24, 138 N.M. 451, 121 P.3d 1050. In this case, Davis testified that she told Defendant that she had to go back to the school. She also testified that she and Meraz inquired about the price for methamphetamine from Defendant, that he quoted them a price per gram, and that they left Defendant and returned later to purchase the drugs. We hold that a jury could infer from the combination of those actions and conversations that Defendant knew that Davis and Meraz were going to transfer the drugs to the ultimate purchaser, who was likely waiting at the school. This being the evidence presented at trial, there was sufficient evidence to support Defendant's conviction for conspiracy.

## CONCLUSION

{39} For the foregoing reasons, we reverse Defendant's convictions and remand for a new trial.

{40} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and MICHAEL D. BUSTAMANTE, Judges.